

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-18-2007

# In Re: Merck & Co

Precedential or Non-Precedential: Precedential

Docket No. 06-2911

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"In Re: Merck & Co " (2007). *2007 Decisions.* Paper 655.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/655

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 06-2911

IN RE: MERCK & CO., INC.
SECURITIES, DERIVATIVE & ERISA LITIGATION

CONSOLIDATED DERIVATIVE ACTION

Hawaii Laborers Pension Plan
and Halpert Enterprises, Inc.,

Appellants

On Appeal from the United States District Court
for the District of New Jersey
(MDL No. 1658 and D.C. Nos. 05-cv-01151 & 05-cv-02368)
District Judge: Hon. Stanley R. Chesler

Argued April 12, 2007

BEFORE: SMITH and COWEN, *Circuit Judges*
and YOHN,* *District Judge*

---

*Honorable William H. Yohn Jr., Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

(Filed July 18, 2007)

Travis E. Downs III
Joseph D. Daley (argued)
Lerach Coughlin Stoia Geller Rudman & Robbins
655 West Broadway, Suite 1900
San Diego, CA 92101

Peter S. Pearlman
Cohn Lifland Pearlman Herrmann & Knopf
Park 80 Plaza West-One
Saddle Brook, NJ 07663

Jeffrey P. Fink
Robbins Umeda & Fink
610 West Ash Street, Suite 1800
San Diego, CA 92101
        *Counsel for Appellant*

Robert D. Joffe
Evan R. Chesler
Robert H. Baron (argued)
David Greenwald
Cravath, Swaine & Moore
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

2

William R. Stein
Roberta Koss
Hughes Hubbard & Reed
1775 I Street, N.W., Suite 600
Washington, DC 20006-2401
     *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

SMITH, *Circuit Judge*.

     This case is part of the massive VIOXX-related litigation. The primary–and narrow–issue on this appeal is whether the District Court erred by refusing to allow the plaintiffs leave to amend their complaint with additional materials they had proffered to the court to show that amendment would not be futile.[1]

---

     [1]The parties have also briefed the issue of whether the District Court properly granted Merck's motion to strike additional materials proffered by the plaintiffs in their opposition to the defendant's motion to dismiss. This legal issue is not significantly different than the after-acquired information issue we directly confront. On this point, the plaintiffs are correct that this issue "boils down to a single question: May plaintiffs use after-acquired materials that defendants voluntarily handed over to them–pursuant to a negotiated agreement–to

This is a shareholder suit, so in the typical situation the plaintiffs would have been required to first make demand upon Merck's Board of Directors. However, the plaintiffs pled demand futility. The District Court dismissed the suit because the plaintiffs did not meet the narrow exception where demand may be excused. Specifically, the plaintiffs did not plead with particularity facts establishing that demand would have been futile at the time they commenced the lawsuit. The District Court concluded that the plaintiffs' allegations of demand futility were "patently conclusory." *In re Merck & Co., Inc.*, 2006 WL 1228595, MDL No. 1658 (SRC), at *13 (D.N.J. May 5, 2006). The District Court did not permit the plaintiffs to amend their complaint with after-acquired information obtained as a result of a discovery stipulation between the parties. *Id*. at 17-18.

We conclude that the District Court erred in denying the plaintiffs leave to amend their complaint with additional materials on the ground that the materials were acquired as a result of a consensual discovery agreement made by Merck and the derivative plaintiffs. We remand the case to the District Court to determine whether, even with these additional materials, amendment would have been futile.

flesh out and amplify the core allegations in an existing complaint?" To the extent that the information in the plaintiffs' opposition to the defendant's motion to dismiss was obtained as a result of the discovery stipulation agreement, it must be considered on remand.

# I.

The District Court has stated the facts of this complicated case concisely and accurately, so we repeat them here:

Merck is a global pharmaceutical company incorporated in New Jersey, which researches, develops, manufactures and markets a broad range of medicines and vaccines that improve human and animal health. Plaintiffs are shareholders bringing this action on behalf of Merck against all individuals who were serving on Merck's Board of Directors as of March 11, 2004–the date the first shareholder derivative action relating to VIOXX was filed–as well as thirteen other current or former directors and officers of the company.

VIOXX is a member of a class of pain medications known as non-steroidal anti-inflammatory drugs ("NSAIDs"). VIOXX is one of a new generation of "selective" NSAIDs called COX-2 inhibitors, which are designed to reduce inflammation and pain while avoiding the risk of serious gastrointestinal side effects associated with traditional NSAIDs. After receiving approval from the Food and Drug Administration ("FDA"), VIOXX was introduced to the market in May 1999. VIOXX was marketed and sold for over five years until September 30, 2004, when Merck voluntarily withdrew the medication.

Plaintiffs contend that scientists within Merck were aware that VIOXX may cause cardiovascular problems for its users as early as 1996. Plaintiffs allege that, from approximately 1996 to 2004, Merck made public statements which promoted the use of VIOXX for treatment of arthritis, and for other pain sufferers. None of these statements, however, mentioned any cardiovascular risks associated with the use of VIOXX, despite Defendants' alleged knowledge of this problem. Plaintiffs contend that Defendants continued to have the Company conceal VIOXX's health risks and repeatedly emphasized safety despite scientific data to the contrary.

In 1999, Merck initiated an 8,000-person VIOXX Gastrointestinal Outcomes Research ("VIGOR") trial designed to prove the drug's gastrointestinal safety benefits. The trial compared people taking a high dose of VIOXX with those taking naproxen, and excluded those at a high risk of heart problems. The results of the VIGOR study came in on March 9, 2000. The results showed that VIOXX patients suffered fewer stomach problems than the naproxen group, but significantly more blood-clot related problems. These results were published in the New England Journal of Medicine in November of 2000. Although the article discussed VIOXX's benefits for the stomach, it did not discuss in any detail information about potential cardiovascular complications.

On February 8, 2001, Merck executives met with the FDA Arthritis Advisory Committee to discuss VIOXX and the VIGOR trial. During the meeting, approximately seven doctors discussed cardiovascular complications associated with VIOXX. Plaintiffs maintain that Defendants, nonetheless, caused Merck to issue a press release on May 22, 2001 in which the Company "reconfirmed the favorable cardiovascular safety profile of VIOXX."

On August 22, 2001, researchers at the Cleveland Clinic published a study in the Journal of the American Medical Association ("JAMA") which discussed the VIGOR study and Celecoxib Long-term Arthritis Safety Study ("CLASS") studies. The article stated that "[t]he annualized myocardial infarction rates for COX-2 inhibitors in both VIGOR and CLASS were significantly higher than that in the placebo group.... The available data raise a cautionary flag about the risk of cardiovascular events with COX-2 inhibitors." Plaintiffs allege that prior to the publication of the article, Defendants caused Merck to publicly claim that "VIOXX does not result in any increase in cardiovascular events compared to placebo," and that it had "additional data beyond what [the Cleveland Clinic] cite[s], and the findings are very, very reassuring." On September 17, 2001, the FDA sent Defendant Gilmartin a warning letter stating that Merck's promotional campaign "minimizes the potentially serious cardiovascular findings that were observed in the [VIGOR] study, and thus, misrepresents the safety profile

for VIOXX." In May 2004, Harvard researchers published the results of a Merck-sponsored study which "found VIOXX was associated with an elevated risk of heart attacks (39% higher), compared to the use of Celebrex or a placebo." Plaintiff alleges that Defendants "demanded that researchers delete or tone down their findings," and that prior to publication of the results, Defendants removed the name of a Merck employee who had worked on the study from the list of authors.

On August 25, 2004, Dr. David Graham, an FDA researcher, presented the results of an FDA study at a medical conference. The results showed that higher doses of VIOXX "may have led to more than 27,000 heart attacks and sudden cardiac deaths" and triple the risk of heart attacks and death. Plaintiffs contend that the following day, Defendants caused Merck to state publicly that they "strongly disagree[d] with Graham's conclusion, and that 'Merck stands behind the efficacy, overall safety and cardiovascular safety of VIOXX.'"

Plaintiffs further allege that Defendants threatened and intimidated numerous academics who publicly questioned or discussed the safety of VIOXX. Plaintiffs maintain that certain Merck directors held the power to withdraw important funding from academic research and also cancelled the presentations of doctors who questioned the safety of VIOXX.

*See In re Merck & Co., Inc.*, 2006 WL 1228595, at **1-3 (internal citations omitted).

Because of the harm allegedly caused by VIOXX, Merck now faces thousands of lawsuits. These lawsuits come in a variety of forms, including product liability and shareholder derivative actions. On February 23, 2005, the Judicial Panel on Multidistrict Litigation transferred all VIOXX-related derivative, securities and ERISA actions to the District of New Jersey for pre-trial consideration and/or coordination. Consolidation occurred on May 6, 2005. The plaintiffs in this case filed their complaint on June 20, 2005, arguing that demand on Merck's Board of Directors would be futile. On June 27, 2005, the Magistrate Judge approved a discovery stipulation agreement between the parties that stated, in relevant part, that "all discovery in the Consolidated Derivative Action, except for requests for production of documents focused on the Merck Board of Directors' actions concerning VIOXX prior to Merck's voluntary withdrawal of VIOXX on September 30, 2004, shall be stayed pending the Court's ruling on the motion to dismiss the Consolidated Derivative Complaint, unless the Court enters an order permitting such discovery to proceed."

In late August 2005, Merck filed a motion to dismiss on the grounds that the plaintiffs had failed to make a pre-suit demand upon the March 2004 Board and had failed to adequately plead demand futility. In November 2005, the plaintiffs filed a redacted version of their memorandum in opposition to the defendants' motion to dismiss. The plaintiffs

also filed an unredacted version of their opposition under seal, which contained arguments and factual assertions that relied on after-acquired information the plaintiffs obtained during the course of discovery. On December 22, 2005, Merck filed a motion to strike the extraneous documents in the plaintiffs' opposition memorandum. At an April 5, 2006 hearing, the District Court granted Merck's motion to strike because it concluded that much of the information in the plaintiffs' unredacted brief was not contained in the complaint and did not constitute the type of material that can be considered on a motion to dismiss pursuant to Rule 12(b)(6). The general rule in demand futility cases is that discovery may not be used to supplement demand futility allegations.

On May 5, 2006, the District Court granted Merck's motion to dismiss the plaintiffs' complaint with prejudice, and also denied the plaintiffs' leave to amend their complaint to supplement their demand futility allegations based on information acquired through discovery.[2]

---

[2]We do not have a proposed amended complaint from the plaintiffs. This Court has refused to permit leave to amend when the party failed to provide the proposed amended complaint, because "the court had nothing upon which to exercise its discretion." *Lake v. Arnold*, 232 F.3d 360, 374 (3d Cir. 2000). However, our situation is different here, because the District Court acknowledged that such a complaint would "incorporate information obtained in discovery, stricken from use in the instant Motion to Dismiss, to supplement and

## II.

The District Court exercised diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1). Our jurisdiction is pursuant to 28 U.S.C. § 1291, because the District Court's dismissal with prejudice constituted a final order.

We review both a district court's refusal to grant the plaintiffs' leave to amend their complaint and a district court's ruling on demand futility under Federal Rule of Civil Procedure 23.1 for abuse of discretion. *Kanter v. Barella*,--- F.3d ----, No. 05-5398, 2007 WL 1519894 (3d Cir. May 25, 2007); *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005). To the extent that the District Court made conclusions of law, our review is *de novo*. *See Blasband v. Rales*, 971 F.2d 1034, 1040 (3d Cir. 1992).

In this case, we are confronted with the decision by the District Court that held, as a matter of law, that after-acquired information obtained through the stipulated discovery agreement could not be used to supplement the plaintiffs' demand futility allegations. We review this conclusion of law *de novo*. Both parties agree that we should apply New Jersey law to this case, as "federal courts hearing shareholders' derivative actions involving state law claims apply the federal procedural

particularize" the initial complaint. *In re Merck & Co., Inc.*, 2006 WL 1228595, at *17.

11

requirement of particularlized pleading, but apply state substantive law to determine whether the facts demonstrate demand would have been futile and can be excused." *Kanter*, 2007 WL 1519894, at *2.

## III.

### A.    Demand

Shareholder derivative suits typically require plaintiffs to make pre-suit demand on the board of directors that the board bring suit on behalf of the corporation. *Blasband*, 971 F.2d at 1048. The reason for this requirement is that "[t]he decision to bring a lawsuit or to refrain from litigating a claim on behalf of the corporation is a decision concerning the management of the corporation and consequently is the responsibility of the directors." *Id.* (citations omitted). There are narrow exceptions when shareholders will be excused from making demand. The New Jersey Supreme Court has adopted Delaware's demand futility standard. *In re PSE & G S'holder Litig.*, 801 A.2d 295, 310 (N.J. 2002); *Kanter*, 2007 WL 1519894, at *4 ("Because the New Jersey Supreme Court in PSE&G sought guidance from Delaware's decisional law, we will do the same here."). As the New Jersey Supreme Court stated, "for shareholder plaintiffs in New Jersey to withstand a motion to dismiss for failure to make a demand, they must plead with particularity facts creating a reasonable doubt that: (1) the directors are disinterested and independent, or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *In re PSE &*

*G*, 801 A.2d at 310.  If, as in this case, the board of directors is being accused of a *failure* to act, then the second prong technically does not apply and demand futility must be shown through the first prong.[3]  *Id.* at 309-10.  The first prong nonetheless requires us to look to the business judgment rule, as "the entire question of demand futility is inextricably bound to issues of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *id.* at 813 (stating that "a conscious decision to refrain from acting may nonetheless be a valid exercise of business judgment and enjoy the protections of the rule").  In this regard, "when the complaint asserts inaction by the board, as here, courts will not excuse demand 'in the absence of allegations demonstrating why the board is incapable of considering a demand'." *Kanter*, 2007 WL 1519894, at *3 (quoting *In re Prudential Ins. Co. Derivative Litig.*, 659 A.2d 961, 975 (N.J. Super. 1995); *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)).  "[W]here inaction is the heart of the allegation, the plaintiff bears the burden of demonstrating a reasonable doubt as to the validity of the business judgment presumption." *Kanter*, 2007 WL 1519894, at *6.

As we have stated, derivative plaintiffs are required to

---

[3]The counsel for the plaintiffs agreed in the motion to strike hearing that the focus is on the first prong:

Court: "In short, I am not dealing with [the] second prong of the demand futility test.  Correct?

Derivative Plaintiffs' Counsel: "In this case all the action is going to be in the first prong."  JA215-16.

establish that demand would have been futile at the time they commenced litigation.  FED. R. CIV. P. 23.1; N.J. CT. R. 4:32-3. A corollary of this rule is that discovery generally may not be used to supplement allegations of demand futility.  *Beam v. Stewart*, 845 A.2d 1040, 1056 (Del. 2004) ("In general, derivative plaintiffs are not entitled to discovery in order to demonstrate demand futility."); *In re PSE & G*, 801 A.2d at 312 (stating that "when a court decides a defendant's motion to dismiss a shareholder's suit for failure to make a demand as required under Rule 4:32-5, the court's review is generally limited to the pleadings"); *Rales*, 634 A.2d at 934 n.10 ("[D]erivative plaintiffs . . . are not entitled to discovery to assist their compliance with Rule 23.1.").  This rule serves the underlying purpose of the demand requirement.  As the District Court stated, "[t]he demand requirement would be rendered meaningless if a plaintiff who cannot establish demand futility when he files suit is nonetheless permitted to amend his pleading using materials later obtained during discovery to justify his failure to make a pre-suit demand."  *In re Merck & Co., Inc.*, 2006 WL 1228595, at *18.  If derivative plaintiffs are allowed to obtain discovery after making conclusory allegations in their complaints to strengthen those very complaints, then shareholder plaintiffs will have incentive to make baseless allegations and then engage in discovery fishing expeditions. Further, except in narrow circumstances, directors and officers should not be burdened with engaging in discovery from shareholders who might have no legitimate basis to sue. The demand requirement would be effectively circumvented if we were to adopt a contrary rule.

14

The District Court began its leave-to-amend discussion by laying out the parameters of Federal Rule of Civil Procedure 15(a), which states in relevant part that "a party may amend its pleadings only by leave of court or written consent of the adverse party; and leave shall be freely given when justice so requires." The District Court then cited *Foman v. Davis*, 371 U.S. 178, 182 (1962), for the proposition that "[i]n the absence of undue delay, bad faith or dilatory motive on the part of the movant, leave to amend should be freely given." *In re Merck & Co., Inc.*, 2006 WL 1228595, at \*17; *see also Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413-14 (3d Cir. 1993).

Futility is also a sufficient ground to deny leave to amend. *Kanter*, 2007 WL 1519894, at \*7. "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). The District Court concluded that amendment would have been futile because it held that the plaintiffs could not rely on after-acquired information to bolster their conclusory allegations of demand futility.

The plaintiffs argue that the District Court improperly adopted a bright-line rule whereby after-acquired information can never be used in demand futility complaints. The plaintiffs rely primarily on our Court's decision in *Blasband* as well as the Sixth Circuit's in *McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001). Merck contends that the plaintiffs' position contradicts the well-settled rule that discovery may not be used to supplement demand futility allegations.

15

In *Blasband*, a plaintiff filed a derivative action alleging that demand was excused. 971 F.2d at 1039. The two issues were whether Blasband had standing to bring the action and whether he established demand futility. The District Court dismissed the complaint, concluding that Blasband did not have standing and did not adequately plead that demand would have been futile. This Court vacated the District Court's decision and remanded, concluding that "[w]e agree with the district court that Blasband has not adequately established that he is excused from making a proper demand. However, we also believe . . . that Blasband does have standing to maintain this derivative action, and we therefore hold that Blasband should be given the opportunity to move to amend the complaint to allege additional facts establishing that a proper demand would have been futile." *Id.* Although the opinion did not address whether Blasband could use discovery, the Court did not place any limitations on the type of information that Blasband could include in his amended complaint. Merck argues that *Blasband* is inapposite because it does not specifically address the use of discovery to amend demand futility allegations.

In *McCall*, the Sixth Circuit reversed a district court decision to not consider an affidavit that the plaintiffs included in their amended shareholder derivative complaint. The *McCall* Court stated that "facts in existence before the derivative claims were filed but not discovered until later, may be considered in determining demand futility." 239 F.3d at 823. Merck attempts to distinguish *McCall* by noting that the discovered information was dated after the first derivative complaint was filed but

16

before the filing of the operative complaint that contained the demand futility allegations scrutinized by the court, and that the material arose out of discovery from separate (but related) litigation.

We need not wade into the *Blasband*/*McCall* debate to resolve this issue. We agree with the District Court and Merck that, as a general rule, a plaintiff in a shareholder derivative suit may not use discovery to amend demand futility allegations. Whether the discovered material existed before or after the filing of the operative complaint does not alter our analysis. However, this case presents a rare exception to this rule because both parties voluntarily entered into a stipulated discovery agreement that did not preclude the plaintiffs from using this after-acquired information in an amended complaint. Thus, the standard argument–that allowing discovery in demand futility scenarios undermines the authority of the corporation to decide whether to bring suit against itself and gives incentive to shareholders to engage in fishing expeditions–has no applicability when the plaintiffs and the corporation voluntarily agree to permit limited discovery.

## B.    The Stipulated Discovery Agreement

As the plaintiffs note, Merck voluntarily negotiated and agreed to the scope of a document production with plaintiffs. The agreement did not result from a District Court ruling. This agreement did not restrict the manner in which plaintiffs could utilize the documents.

17

Paragraph 5 of the June 27, 2005 discovery stipulation is particularly relevant to our discussion:

> Without limiting the scope of ¶1 above, all discovery in the Consolidated Derivative Action, **except for requests for production of documents focused on the Merck Board of Directors' actions concerning VIOXX prior to Merck's voluntary withdrawal of VIOXX on September 30, 2004**, shall be stayed pending the Court's ruling on the motion to dismiss the Consolidated Derivative Complaint, unless the Court enters an order permitting such discovery to proceed.

The general rule that discovery may not be used to supplement demand futility allegations has no applicability in a case where the parties voluntarily agree to permit discovery to go forward on the one area that has particular import for the motion to dismiss. We recognize that the discovery stipulation was entered into shortly after the initial complaint was filed. This stipulation, though, contains no limitation on how this after-acquired information may be used. When this fact is coupled with the general policy of liberal amendment of pleading standards, we must conclude that the District Court should have considered this after-acquired information in its discussion of whether the plaintiffs may amend their complaint. The District

Court erred as a matter of law in refusing to consider the discovery that resulted from the consensual stipulation. We will therefore remand this case so that the District Court may examine whether the after-acquired information discovered as a result of the stipulation affects its conclusion that amendment would have been futile.[4]

### C.      Whether Demand Would be Futile

We decline to examine whether demand would have been futile in light of the information acquired through the June 27, 2005 discovery stipulation agreement. We recognize the superior position of the District Court in addressing this issue.[5]

---

[4]We reject the argument that allowing consideration of information obtained pursuant to a discovery stipulation will discourage negotiated settlements of discovery disputes. The parties can simply provide in the discovery stipulation a provision that information obtained pursuant to the stipulation may not be used to supplement demand futility allegations in the complaint.

[5]We also do not address the applicability of Merck's exculpatory charter provision to this case, but we do note that courts routinely examine exculpatory agreements in demand futility motions to dismiss. *See, e.g.*, *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003).

In the interests of judicial economy, however, we write to emphasize that the applicability of the business judgment rule in board inaction cases focuses on whether the Board could not be considered disinterested (the *Aronson* first prong) because of the potential liability its members face. As the District Court properly noted, this standard is quite high, so that in order for demand to be excused as futile the board members must face "a substantial likelihood" of liability. *See Rales*, 634 A.2d at 936 (quoting *Aronson*, 473 A.2d at 815). The leading case on "substantial likelihood" from the Supreme Court of Delaware has stated that a board's actions must be "egregious" to meet this standard. *See Aronson*, 473 A.2d at 815. Further, the business judgment rule provides directors with a "powerful presumption[]," *Rales*, 634 A.2d at 933, "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 473 A.2d at 812. This standard has been oft repeated, and in some cases strengthened, in Delaware and New Jersey. *See, e.g.*, *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246 (Del. 1999) ("The presumptive validity of a business judgment is rebutted in those rare cases where the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." (quotation omitted)).

In light of the business judgment presumption as well as the standard for demand futility in board inaction cases, the District Court on remand must inquire into whether the after-

acquired information, as well as the information contained in the initial complaint, supports the position that the Board recklessly ignored a well-established link between VIOXX and increased cardiovascular risk to establish that the Board acted egregiously or in bad faith. Because the plaintiffs do not challenge the District Court's conclusion that the original complaint's allegations were "patently conclusory," the question before the District Court will be whether the additions permitted by virtue of this opinion will transform the complaint from patently conclusory to a complaint that establishes to a sufficient degree of particularity that the March 2004 Directors approved, participated in, or caused Merck to make strategic decisions regarding the marketing of VIOXX.[6]

We also write to state that the District Court properly distinguished *In re Tower Air, Inc.*, 416 F.3d 229 (3d Cir. 2005) from facts alleged in the plaintiffs' unamended complaint in this case. In *Tower Air*, we reversed the dismissal of a breach of fiduciary duty claim where the company's officers

> did nothing when they were told by the corporate Director of Safety of quality assurance problems with aircraft maintenance and of failures to record maintenance and repair work. Whether the

---

[6]The original complaint's allegations, however, might be viewed in a different light because the after-acquired information will presumably amplify those allegations.

21

> officers' behavior is construed as an egregious decision or as unconsidered inaction, that allegation is troubling. Under no circumstances should aircraft maintenance problems be ignored. Lives are on the line . . . . We can imagine few things more egregious. The officers' alleged passivity in the face of negative maintenance reports seems so far beyond the bounds of reasonable business judgment that its only explanation is bad faith.

*Id.* at 239. The plaintiffs analogize the facts of *Tower Air* to the present matter, asserting that the Board, by knowing the cardiovascular risks of VIOXX, put "lives on the line" in an egregious manner. This analogy is legally and factually inapposite.

With respect to the legal distinctions, *Tower Air* did not deal with demand futility and applied a notice pleading standard under Federal Rule of Civil Procedure 8 instead of the heightened factual pleading standard under Federal Rule of Civil Procedure 23.1.

This Court in *Tower Air* suggested that a director or officer acts egregiously and in bad faith when the director or officer's passivity/inaction/nonfeasance in the face of a known and obvious risk results in a potentially life threatening

situation.  Here, the situation is factually different.  As explained by the District Court

> First, the safety concerns in *Tower Air* were brought to the attention of the officers controlling the company's management and operations. Ignoring safety risks can be more easily characterized as "egregious" where the information lies in the hand of those officers involved in actually running the corporation on a day to day basis, as opposed to a group of predominantly outside directors with little involvement in the operations of the corporation. Second, there is a significant difference between the safety warnings given to the officers in *Tower Air*, and those allegedly before Merck's Board. The safety information provided to the officers in *Tower Air* revealed documented problems with aircraft maintenance and repair work.  These reports were *unquestionably negative* and illustrated serious risks to public safety.

*In re Merck & Co., Inc.*, 2006 WL 1228595, at *13 n.5 (emphasis added).  Of course, we express no opinion about whether the newly acquired facts that are included in the amended complaint will alter this analysis.  The District Court will, on remand, examine whether the plaintiffs' allegations show that the Board knew that VIOXX caused cardiovascular harm and then chose to do nothing about it.  The allegations

must not simply demonstrate an aloof or negligent Board, but nonfeasance that rose to the level of egregiousness or bad faith.

## IV.

We will therefore reverse and remand the judgment of the District Court for consideration of whether the information acquired as a result of the stipulated discovery agreement still renders the amended complaint futile.