**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

FORREST G. QUINN,
   *Plaintiff-Appellant,*

v.

ANVIL CORPORATION; ANVIL
EMPLOYEE STOCK OWNERSHIP PLAN;
GENE ANDERSON; P. K. CONNOR;
OWEN OLSEN; JOHN MACPHERSON;
HENRY KEI; JOHN E. JOHNSON; JOHN
E. JOHNSON, LLC; DOES 1-20,
   *Defendants-Appellees.*

No. 09-35101

D.C. No.
2:08-cv-00182-RSL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, Chief District Judge, Presiding

Argued and Submitted
May 6, 2010—Seattle, Washington

Filed August 24, 2010

Before: Kim McLane Wardlaw and Ronald M. Gould,
Circuit Judges, and Richard Mills, Senior District Judge.*

Opinion by Judge Gould

---

*The Honorable Richard Mills, Senior United States District Judge for the Central District of Illinois, sitting by designation.

12667

## COUNSEL

Mark Ferrario (argued), Tami D. Cowden, Greenberg Traurig, LLP, Las Vegas, Nevada, for the appellant.

Scott A. Smith (argued), William P. Brewer, Riddell Williams P.S., Seattle, Washington, for the appellees.

## OPINION

GOULD, Circuit Judge:

Forrest Quinn appeals the district court's judgment dismissing for lack of standing his diversity derivative action seeking damages from Anvil Corporation ("Anvil"), its board of directors (the "Board"), and others for breach of fiduciary duty, breach of contract, and negligence. During the pendency of Quinn's suit, Anvil proposed an amendment to its articles of incorporation (the "Amendment"), which, among other things, would effect a reverse stock split divesting Quinn of his fifty shares of Anvil stock. The district court denied Quinn's motion preliminarily to enjoin the Amendment. After the Amendment passed, the court denied Quinn's request for further discovery and dismissed Quinn's derivative action because, lacking shares, Quinn lost standing to assert claims

derivatively on behalf of the corporation under Federal Rule of Civil Procedure 23.1's continuous ownership requirement. The district court denied Quinn's motion for reconsideration of the dismissal. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

# I

Anvil is a privately held Washington company that provides engineering services to petroleum companies in the Northwest. Quinn's uncle, Lorren Levorsen, founded Anvil in 1971. Quinn was employed by Anvil in the late 1970s and early 1980s. In 1996, Levorsen established an Employee Stock Ownership Plan ("ESOP") for Anvil employees. In 1997, Levorsen gave his remaining Anvil stock to a family limited-liability company, with equal ownership interests divided among Quinn, Levorsen's niece, and Levorsen's two stepsons. Beginning in 2001, Quinn wrote letters to Levorsen and Anvil's leadership urging the adoption of more aggressive strategies to increase the value of Anvil's stock. Quinn also wrote Anvil's executives to report asserted deficiencies that he perceived in the valuation of Anvil's stock made in connection with the administration of the ESOP.

Beginning in 2003, Quinn initiated a series of related lawsuits against Anvil and its leadership, alleging undervaluation of its stock. Quinn's first lawsuit was dismissed on jurisdictional grounds shortly after being filed in 2003 in California. Quinn's second lawsuit, brought in Washington state court in 2004, was settled in 2007. In February 2008, Quinn filed this derivative shareholder suit in the United States District Court for the Western District of Washington. The only Anvil stock Quinn owned when he filed the suit was fifty shares given to him by his parents before the commencement of this suit. Quinn named as defendants Anvil, the ESOP, several then-current Board members, and others ("Defendants"). Quinn alleged that appraisals used for ESOP valuation were flawed and resulted in undervaluation of Anvil's stock. Quinn sought

damages for breach of fiduciary duty, breach of contract, and negligence.

On July 14, 2008, while Quinn's lawsuit was pending, Anvil's Board unanimously adopted a resolution to amend Anvil's articles of incorporation (the "Resolution"). The Resolution stated that the proposed Amendment would "restrict ownership of substantially all of the Company's common stock to employees and the ESOP" and effect a reverse stock split whereby each sixty shares of Class A Common Stock would be automatically converted to one share of common stock. A shareholder with less than sixty shares would not be entitled to receive a fractional share, but would instead receive a cash payment in lieu thereof. Thus the Resolution would eliminate share ownership of those holding less than sixty shares. The Resolution set a shareholder vote on the Amendment for August 5, 2008.

On or about July 15, 2008, Anvil's Board distributed proxy materials to Anvil's shareholders. The proxy materials said that the purpose of the Amendment was to facilitate employee ownership of Anvil, which Anvil considered to be an important part of its culture and also "important to its clients and suppliers." The Amendment would achieve this goal by permitting Anvil to repurchase employees' shares at the end of their employment and by conducting the reverse stock split. The proxy materials explained that, as a result of the reverse stock split, a shareholder with fewer than sixty shares would get cash but would "no longer be an Anvil shareholder." One of the persons with fewer than sixty shares, the Board disclosed, was Quinn. Based on the Board's determination that $120 exceeded the fair value of a share of Class A Common Stock, holders of fractional shares would receive a payment equivalent to the share fraction—the ratio of shares held divided by sixty shares—multiplied by $7,200.[1] The materials

---

[1]For example, a hypothetical shareholder owning 121 shares of Class A Common Stock would receive two new shares of common stock, and a cash payment of $120 for the 1/60 fractional share.

also stated that a dissenting shareholder "with fewer than 60 shares of Class A Common Stock" had appraisal rights to "obtain payment of the fair value of the shareholder's shares."

On July 18, 2008, Defendants filed with the district court a "Notice of Action that May Leave Plaintiff with no Anvil Shares." The notice told Quinn and the court that an August 5 shareholder meeting had been scheduled to vote on the Amendment, and that the Amendment, if approved, would, among other things, effect a reverse stock split leaving Quinn with no shares and, consequently, no standing to pursue this case. Quinn moved for a temporary restraining order and for a preliminary injunction against the shareholder vote. On August 4, the district court denied the motion and, the next day, the shareholders approved the Amendment with near unanimity. Quinn notified Anvil that he would exercise his appraisal rights.

Thereafter, Defendants filed a supplemental motion to dismiss the action for lack of standing. The district court stayed further discovery pending resolution of the motion. Quinn opposed the motion with declarations and exhibits, and simultaneously moved for leave to conduct discovery, arguing that further discovery was necessary to oppose Defendants' motion. The court granted the supplemental motion to dismiss, reasoning that because Quinn no longer held any shares of Anvil stock, he did not meet Federal Rule of Civil Procedure 23.1's requirement that a plaintiff in a derivative shareholder suit hold shares throughout the litigation. The district court rejected Quinn's argument that the reverse stock split should be unwound due to fraud or procedural irregularity, reasoning that Quinn had no evidence of fraud and that the procedural irregularities asserted by Quinn were unsupported or immaterial. The district court also rejected as without foundation in Ninth Circuit caselaw Quinn's argument that he should be able to maintain his derivative suit based on equitable considerations because, as Quinn contended, Anvil's reverse stock split had no purpose other than to end his law-

suit. The district court was not persuaded that Quinn was entitled to further discovery.

Quinn moved for reconsideration of the dismissal and argued, based on financial information he received from Anvil after electing appraisal, that Anvil had undervalued its shares in setting the compensation for fractional shares in the reverse stock split. The district court denied Quinn's motion, concluding that even if it considered this new evidence, it would not unwind the reverse stock split because the new evidence did not suggest fraud. Quinn's timely appeal followed.

## II

The first issue raised by Quinn's appeal is whether we should reverse the district court's decisions not to enjoin or unwind the reverse stock split and restore Quinn's shares. Quinn's request that the district court unwind the reverse stock split is properly understood as a request for preliminary equitable relief. *See Yamamoto v. Omiya*, 564 F.2d 1319, 1323-24 (9th Cir. 1977) (shareholder's suit seeking to void a sale consummated through allegedly misleading and deceptive proxy solicitations characterized as a request for "equitable relief").[2] We review the district court's decisions denying the preliminary injunction against the reverse stock split for abuse of discretion. *See Nader v. Brewer*, 386 F.3d 1168, 1169 (9th Cir. 2004) (per curiam) (denial of preliminary injunction reviewed for abuse of discretion); *see also MacDonald v. Grace Church Seattle*, 457 F.3d 1079, 1081 (9th Cir. 2006) (denial of motion for reconsideration reviewed for abuse of discretion). A district court abuses its discretion in denying a preliminary injunction if it bases its decision on "an erroneous legal standard or clearly erroneous findings of

---

[2]To the extent that Quinn argues that the reverse stock split was inoperative to deprive him of standing even though he now has no shares, his argument is that he has equitable standing, which we address below in Part III.

fact." *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098, 1104 (9th Cir. 2010); *see also United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).

**[1]** Quinn attacks the reverse stock split on two state-law grounds: first, that it was fraudulent, and second, that the Amendment was procedurally flawed. Entitlement to a preliminary injunction requires showing, among other things, likely success on the merits. *Cal. Pharmacists*, 596 F.3d at 1104. Because Quinn sought the appraisal remedy, Washington law precludes him from attacking the Amendment unless he shows that it was fraudulent or procedurally flawed. *See* Wash. Rev. Code § 23B.13.020(2); *Sound Infiniti, Inc. v. Snyder*, 186 P.3d 1107, 1112 (Wash. Ct. App. 2008), *review granted* 203 P.3d 379. Quinn, however, has not demonstrated likelihood of success on the merits of his state-law claims that the Amendment involved fraud or procedural irregularity. We hold that the district court was within its discretion in not enjoining or unwinding the reverse stock split.[3] *See Cal. Pharmacists*, 596 F.3d at 1104*; Hinkson*, 585 F.3d at 1262*.*

**[2]** Arguing that the Amendment was fraudulent, Quinn takes issue with the Board's statements in the proxy materials that $120 was "not less than the current fair value" of a share of Class A Common Stock and was "higher than its current value." Under Washington law, a representation is only fraudulent if it is both material and false. *See Baertschi v. Jordan*, 413 P.2d 657, 660 (Wash. 1966). The district court did not find the representations concerning the share value fraudulent, stating, "Plaintiff seeks to draw a one-to-one correlation between net income and stock price, a valuation process that

---

[3]The district court articulated the preliminary injunction standard in denying Quinn's motion for preliminary relief. Although the district court, in its orders granting Defendants' supplemental motion to dismiss and denying Quinn's motion for reconsideration, did not again recite this standard in declining to unwind the reverse stock split, we may affirm the dismissal on any ground supported by the record. *See United States v. Washington*, 573 F.3d 701, 706 (9th Cir. 2009).

ignores all other facts that affect the value of a company's stock (such as one-time asset sales, planned expenditures, and prospects for new business)." This finding was not clearly erroneous. The $120 figure exceeded the most recent independent-appraisal price of $93.97 and was also higher than prior independent appraisals. Nor was the share price material to the Amendment because Anvil's shareholders, other than those few with less than sixty shares, retained their equity in Anvil with only fractional shares cashed out. *See Martin v. Miller*, 600 P.2d 698, 699-700 (Wash. Ct. App. 1979) (stating that a fact is material if a reasonable person would attach importance to its existence in determining his or her action).

**[3]** Quinn next contends that the proxy materials were fraudulent because they omitted material facts. Quinn argues that it was fraud for Anvil not to disclose Quinn's allegations, that the Amendment would end Quinn's lawsuit, that Anvil employees who brought future derivative suits would risk termination, and that certain Anvil Board members had conflicts of interest because they either had a financial interest in the Amendment due to their acquisition of undervalued option stock or are defendants (or related to a defendant) in this suit. But these omissions were not fraudulent because Quinn has not established that there is a substantial likelihood that this information would have been important to shareholders in deciding how to vote on the Amendment. *See Guarino v. Interactive Objects, Inc.*, 86 P.3d 1175, 1185 (Wash. Ct. App. 2004). The proxy materials disclosed that the Amendment would divest Quinn of his shares, severing Anvil's relationship with Quinn. The Amendment was neither a referendum on the directors nor the independent appraisal process, so the greater specificity concerning Quinn's allegations and the nature of his lawsuit that Quinn suggests was required was not necessary. There was no need for Anvil to disclose that employees would bring future suits at risk of termination because Quinn's contention of potential retaliation is unsupported.

Concerning the alleged Board-member conflicts, we reject Quinn's conclusory assertion that certain Board members were conflicted because they "owned shares based on Anvil's faulty appraisals." And even assuming, as Quinn argues, that three of the seven Board members—P.K. Connor, John Mac-Pherson, and Scott Anderson—were conflicted because of their ties to this suit, the remaining four directors unanimously voted to adopt the Amendment. This was sufficient to establish a quorum, *see* Wash. Rev. Code § 23B.08.720(3), and to validly ratify the Amendment, *see id.* §§ 23B.08.710, 23B.08.720(1). Anvil's treatment of these alleged conflicts, if they were conflicts at all, was procedurally proper and not fraudulent.

**[4]** Quinn also did not show that the Amendment was otherwise procedurally flawed. Quinn argues that shareholders had to approve the Amendment through separate group voting. *See* Wash. Rev. Code § 23B.10.040(1). Quinn is mistaken. The Redemption Agreement between Levorsen and Anvil did not create a separate series or class of stock entitled to a separate vote.[4] Separate group voting was unnecessary. Because Quinn cannot show likelihood of success on his state-law claims of fraud and procedural infirmity in the Amendment, we conclude that the district court did not abuse its discretion in declining preliminarily to enjoin or unwind the reverse stock split.

## III

The second issue raised by Quinn's appeal is whether, despite not holding shares after the Resolution was implemented, Quinn meets Federal Rule of Civil Procedure 23.1's standing requirements for a shareholder derivative action. We review de novo whether Quinn has derivative standing to

---

[4]Because we earlier concluded that Quinn has not shown that the Amendment was fraudulent, we likewise reject his contention that fraud rendered the Amendment procedurally infirm.

assert claims on behalf of Anvil. *Kona Enters., Inc. v. Estate of Bishop*, 179 F.3d 767, 769 (9th Cir. 1999).

**[5]** The normal rule is that a corporation is run by its management, and the corporation itself has the right to make claims. *See Potter v. Hughes*, 546 F.3d 1051, 1058 (9th Cir. 2008) ("[T]he general rule of American law is that the board of directors controls a corporation."). A derivative action is an extraordinary process where courts permit "a shareholder to step into the corporation's shoes and to seek in its right the restitution he could not demand in his own." *Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir. 1983) (quotation marks omitted); *see Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) ("Because of the fear that shareholder derivative suits could subvert the basic principle of management control over corporate operations, courts have generally characterized shareholder derivative suits as a remedy of last resort." (quotation marks omitted)).

**[6]** Because of the extraordinary nature of a shareholder derivative suit, Rule 23.1 establishes stringent conditions for bringing such a suit. *Potter*, 546 at 1058 ("[S]trict compliance with Rule 23.1 and the applicable substantive law is necessary before a derivative suit can wrest control of an issue from the board of directors."). First, plaintiffs must comply with Rule 23.1's pleading requirements, including that the plaintiff "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors." *Id.* at 1056 (quotation marks omitted); *see* Fed. R. Civ. P. 23.1(b). Second, Rule 23.1 states that a derivative action brought by "one or more shareholders . . . to enforce a right" of a corporation "may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association." Fed. R. Civ. P. 23.1(a). We have inferred from this language not only "that a derivative plaintiff be a shareholder at the time of the alleged wrongful acts" but also "that the plaintiff retain own-

ership of the stock for the duration of the lawsuit"—the so-called "continuous ownership requirement." *Lewis*, 719 F.2d at 1047. If a shareholder is divested of his or her shares during the pendency of litigation, that shareholder loses standing. *See id.*

[7] This second requirement, the continuous ownership requirement, as the district court properly recognized, forecloses Quinn's derivative action. By operation of the reverse stock split, Quinn's fifty shares were cancelled and Quinn thereafter held no Anvil stock. Quinn's derivative claims are an "intangible asset" belonging to Anvil, not to Quinn. *See id.* Quinn, a nonshareholder, cannot benefit from any recovery the company obtains from Defendants in a derivative suit and therefore, unlike Anvil's continuing shareholders, Quinn does not have "an interest in pursuing the claims." *See id.* We therefore hold that, after the reverse stock split, Quinn did not meet Rule 23.1's continuous ownership requirement.

Quinn nevertheless urges us to recognize an exception to Rule 23.1's continuous ownership requirement because, as he describes it, Anvil conducted the reverse stock split only to terminate his pending lawsuit, and the Amendment was permeated by fraud and procedural flaws.[5] We have rejected applying an equitable exception to the continuous ownership requirement, and Quinn provides no compelling reason why we should apply one now. *See id.* at 1046-48 (rejecting argument of former shareholder that we should recognize equitable standing where the company's leadership conducted an asset sale during the pendency of the litigation to allegedly "insulat[e] themselves from liability");[6] *Kona*, 179 F.3d at 770

---

[5]Although Quinn and Anvil present arguments about whether Quinn would have standing under Washington law, we need not decide this issue. The continuous ownership requirement imposed by Rule 23.1 of the Federal Rules of Civil Procedure is procedural and therefore applies in diversity actions such as this one. *Kona*, 179 F.3d at 769.

[6]Quinn attempts to distinguish *Lewis*, arguing that, unlike in *Lewis*, 719 F.2d at 1048, here there was inadequate disclosure concerning the Board

(rejecting equitable standing where former shareholder did not challenge the stock foreclosure that divested shareholder of shares and company was still in existence).

**[8]** To the extent that other courts have recognized exceptions to the continuous ownership requirement, these exceptions are inapplicable here. First, some courts have recognized equitable standing where a shareholder challenges a corporate transaction that resulted in no continuing shareholders that could bring derivative claims. In *Lewis*, for example, we cited state court decisions recognizing equitable standing "when officers or directors breached their fiduciary duty in connection with" a corporate merger that resulted in "*dissolution of a corporation*." 719 F.2d at 1048 (emphasis added). Similarly, the cases we cited in *Kona* (and relied upon by Quinn) involved challenges to stock foreclosures or mergers where, absent equitable standing, none of the original shareholders could bring a claim on behalf of the company. 179 F.3d at 770.[7] Although Quinn challenges the divesting transaction as fraudulent or procedurally flawed, his state-law claims are inadequate to support preliminary relief, and his challenge does not fit within this exception because he challenges only a reverse stock split. After the reverse stock split, in contrast to a stock sale (or foreclosure) depriving all original shareholders of stock or a merger involving a disappearing company, Anvil's corporate personhood persists with its original shareholders continuing to hold stock in Anvil (unless they held fewer than sixty shares). The interest that motivated the recognition of equitable standing in the cases above—ensuring that a mean-

---

members' purported conflicts and Quinn's allegations. Even assuming that Anvil's disclosure to shareholders was less extensive than that in *Lewis*, that alone is not enough for us to conclude that equity warrants a different result here.

[7]The state cases cited by Quinn likewise involved challenges to mergers. *See Lewis v. Anderson*, 477 A.2d 1040, 1046 n.10 (Del. 1984) (recognizing exceptions to the continuous ownership requirement in certain merger cases); *Platt Corp. v. Platt*, 21 A.D.2d 116, 124 (N.Y. App. Div. 1964) (company ceased to exist after merger).

ingful mechanism exists to review the lawfulness of a transaction that divests all former shareholders of shares—is not implicated here.

**[9]** Second, courts have suggested that equitable standing may be appropriate where there is no business justification for a transaction other than to terminate a lawsuit. *See Zauber v. Murray Sav. Ass'n.*, 591 S.W.2d 932, 938 (Tex. Civ. App. 1979) ("If no valid business purpose exists, a court of equity will consider the destruction of a stockholder's status a nullity and allow him to proceed with the suit in the name of the corporation."); *Teschner v. Chicago Title & Trust Co.*, 322 N.E.2d 54, 57-58 (Ill. 1974) (upholding a reverse stock split where the defendant corporation represented that the purpose of the reverse stock split was "to reduce corporate expenses and simplify and facilitate procedures"). Anvil's Resolution and proxy materials explicitly related the Amendment's legitimate business purpose of consolidating ownership of Anvil within its employees for the benefit of Anvil's employees, its culture, and its relationship with clients and suppliers.[8] Quinn, however, has not offered credible evidence, but rather only his self-serving assertions that the purpose of Anvil's Amendment was to terminate his lawsuit. Because evidence showed a legitimate reason for the transaction, this exception is therefore likewise inapplicable.

**[10]** Nor does our decision leave Quinn without potential recourse for his grievances. A shareholder derivative suit is "a remedy of last resort," *Kayes*, 51 F.3d at 1463, and Quinn had available to him in his appraisal rights a remedy of first resort. Moreover, to the extent that Quinn is personally aggrieved,

---

[8]Although Anvil acknowledged that one of the consequences of the Amendment was that Quinn lost standing to pursue his lawsuit and that the shareholders were motivated in part to pass the Amendment in the hopes that it would end the litigation, Anvil has consistently maintained that the Amendment was motivated with the legitimate business purpose of employee ownership in mind.

his recourse would be to bring a *direct* action against Anvil. Equity does not favor permitting Quinn standing to pursue *derivative* claims on behalf of Anvil, contrary to the requirements of Federal Rule of Civil Procedure 23.1 as consistently interpreted by us to require continuous ownership.

Quinn next protests that the district court, in deciding that he did not meet Rule 23.1's standing requirements, erred by not taking as true his allegations that the Amendment was fraudulent, procedurally infirm, and without legitimate business purpose, instead holding him to a level of proof required at trial. But Quinn advanced no argument to the district court, either in opposing dismissal or on reconsideration, that he was entitled to rest on these allegations, without commensurate proof, to establish standing. To the contrary, Quinn addressed Defendants' evidence head on and submitted declarations and many exhibits. We will not entertain Quinn's attack on the procedure used by the district court in deciding Quinn's suitability as a plaintiff under Rule 23.1. *See Hornreich v. Plant Indus., Inc.*, 535 F.2d 550, 552 (9th Cir. 1976) ("In determining the adequacy of appellant as a representative of other shareholders [under Rule 23.1], the court was entitled to rely not only upon the pleadings, but also the affidavits submitted by the parties relating information of direct consequence to the issue before the court. The appellant having made no objection to the procedure followed in the district court . . . is in no position to complain." (citations omitted)); *United States v. Flores-Payon*, 942 F.2d 556, 558 (9th Cir. 1991) ("Issues not presented to the trial court cannot generally be raised for the first time on appeal.").

**[11]** But our decision would be the same even if we gave full force to Quinn's position. Quinn quotes *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), for the proposition that he need only establish standing "with the manner and degree of evidence required at the successive stages of the litigation," *id.* at 561. Quinn conceded in his opening brief that Defendants' supplemental motion to dismiss "addressed matters that

occurred subsequent to the filing of the Complaint, and included matters extraneous to the pleadings," and the district court "could have considered the motion under the standards of [Federal Rule of Civil Procedure] 56." If, as Quinn argues, *Lujan*'s standard applies, it directs that Quinn could "no longer rest on . . . mere allegations," and at bare minimum had to "set forth by affidavit or other evidence specific facts" demonstrating that he met the requirements for derivative standing. *Id.* (quotation marks omitted). He failed adequately to do this. Although Quinn opposed with declarations and exhibits the supplemental motion to dismiss, Quinn did not show that he met the continuous ownership requirement of Rule 23.1. We hold that the district court properly dismissed Quinn's action and was within its discretion in denying reconsideration of the dismissal.

## IV

Quinn also challenges the district court's denial of his motion for leave to conduct discovery. We review district court rulings on discovery matters for abuse of discretion. *Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1009 (9th Cir. 2004).

**[12]** Quinn contends that additional discovery was necessary to oppose Defendants' supplementary motion to dismiss. It is not settled how much, if any, discovery a derivative plaintiff is entitled to receive before opposing a motion to dismiss for noncompliance with Rule 23.1's continuous ownership requirement. *Cf. In re Merck & Co., Inc. Secs., Derivative & ERISA Litig.*, 493 F.3d 393, 400 (3d Cir. 2007) ("[D]erivative plaintiffs are not entitled to discovery to assist their compliance with Rule 23.1" (internal quotation marks omitted)); *but cf. Fagin v. Gilmartin*, 432 F.3d 276, 285 & n.2 (3d Cir. 2005) (stating that although "Rule 23.1 does not address discovery, neither allowing nor prohibiting it," where material outside the pleadings must be assessed in deciding demand futility, "limited discovery seems in order"). Assum-

ing without deciding that some discovery is warranted in opposing a motion to dismiss predicated on Rule 23.1's continuous ownership requirement where facts outside the pleadings must be considered, Quinn had an opportunity to conduct discovery in advance of the shareholder vote. Quinn did not demonstrate that further opportunity for discovery was justified or warranted. Contrary to Quinn's contentions, he was not entitled to further discovery or a hearing concerning the valuation issues that underlie his derivative claims. As the district court noted, the valuation issue "ha[d] been beaten to death, it seems, over the years of litigation."

**[13]** Although Quinn claimed that protective orders prevented him from using material obtained through prior litigation, Quinn never filed a motion seeking relief from any protective orders. Quinn's one-sentence request to use confidential documents obtained in other litigation without filing them under seal contained at the end of his "Statement Regarding Filing Documents Under Seal" was not a formal motion for relief from the protective order, and the district court was within its discretion in not granting a request so tendered. We hold that the district court did not abuse its discretion in denying Quinn further discovery. *See Hinkson*, 585 F.3d at 1262.

**AFFIRMED.**