**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; TURTLE ISLAND RESTORATION NETWORK; JAPAN ENVIRONMENTAL LAWYERS FEDERATION; SAVE THE DUGONG FOUNDATION; ANNA SHIMABUKURO; TAKUMA HIGASHIONNA; YOSHIKAZU MAKISHI, *Plaintiffs-Appellants*, <br><br> v. <br><br> JAMES MATTIS, in his official capacity as the Secretary of Defense; UNITED STATES DEPARTMENT OF DEFENSE, *Defendants-Appellees*. | No. 15-15695 <br><br> D.C. No. 3:03-cv-04350-EMC <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted March 15, 2017
San Francisco, California

Filed August 21, 2017

Before: Ferdinand F. Fernandez, Mary H. Murguia,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Murguia

**SUMMARY**\*

---

### National Historic Preservation Act / Administrative Procedure Act

The panel affirmed in part, reversed in part and remanded for further proceedings in an action brought by environmental groups and individuals who challenged a decision by the U.S. Department of Defense to construct a new military base on Okinawa, Japan.

Plaintiffs, seeking to protect a local animal population and cultural property from the base's alleged adverse effects, brought claims for declaratory and injunctive relief based on the Government's alleged violations of Section 402 of the National Historic Preservation Act, 54 U.S.C. § 307101(e), and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.

Reversing the district court, the panel held that plaintiffs had standing to pursue declaratory relief, limited to whether the Government's evaluation, information gathering, and consultation process pursuant to the National Historic Preservation Act Section 402 discharged the Government's obligations under the Act and otherwise satisfied the requirements of the Administrative Procedure Act. Applying *Baker v. Carr*, 369 U.S. 186 (1962), the panel agreed with the district court that plaintiffs' claims for declaratory relief did not present a political question that would prevent judicial review.

---

**\*** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that plaintiffs also had Article III standing to pursue injunctive relief and that the claims for injunctive relief did not present a political question implicating any *Baker* factors. The panel remanded to the district court for further proceedings so that the district court could address the merits of the claims in the first instance.

## COUNSEL

Sarah Burt (argued) and J. Martin Wagner, Earthjustice, San Francisco, California, for Plaintiffs-Appellants.

Mark R. Haag (argued), Peter Kryn Dykema, and Andrew C. Mergen, Attorneys; John C. Cruden, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Jonathan C. McKay, Office of General Counsel, Department of the Navy, Washington, D.C.; Phillip J. Riblett, Office of the Legal Adviser, United States Department of State, Washington, D.C.; for Defendants-Appellees.

Brian R. Turner, San Francisco Field Office, National Trust for Historic Preservation, San Francisco, California; Elizabeth S. Merritt and William J. Cook, National Trust for Historic Preservation, Washington, D.C.; for Amicus Curiae National Trust for Historic Preservation.

**OPINION**

MURGUIA, Circuit Judge:

The U.S. Department of Defense (the Government) approved the location, construction, and specifications for a military base in Okinawa, Japan. Individuals and organizations seek to protect a local animal population and cultural property from the base's alleged adverse effects by bringing claims for declaratory and injunctive relief based on the Government's alleged violations of Section 402 of the National Historic Preservation Act (NHPA), 54 U.S.C. § 307101(e),[1] and the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq*. The plaintiffs allege the Government failed to "take into account" the base's impact on their cultural, aesthetic, economic, and environmental interests. The district court dismissed the case, concluding that it lacked jurisdiction to hear the claims for declaratory relief because plaintiffs lacked standing to seek declaratory relief, and concluding that it could not hear the claim for injunctive relief because resolving that claim involved deciding a political question. We conclude that the plaintiffs have standing to bring their declaratory relief claims and that plaintiffs' injunctive relief claim does not present a political question. We therefore affirm the district court's conclusion that plaintiffs' claims for declaratory relief do not present a

---

[1] At the time of the district court decisions in this proceeding, NHPA Section 402 was codified at 16 U.S.C. § 470a-2. In December 2014, after the district court decision now under appeal, NHPA Section 402 was moved to Title 54 of the U.S. Code, and the specific provision now is found at 54 U.S.C. § 307101(e). Act of Dec. 19, 2014, Pub. L. No. 113-287, 128 Stat. 3094, 3231 (Dec. 19, 2014). All references in this opinion to NHPA Section 402 refer to the same underlying provision as the statute cited in the district court decisions.

political question; reverse the district court's conclusion that plaintiffs lack standing to seek declaratory relief; and reverse the district court's conclusion that plaintiffs' claim for injunctive relief presents a political question. We remand to the district court for further consideration of plaintiffs' claims for declaratory and injunctive relief. [2]

## I. Background and Procedural History

### A. The Okinawa Dugong

The dugong is a species of marine mammal resembling a manatee. *See Ctr. for Biological Diversity v. Hagel*, 80 F. Supp. 3d 991, 994 (N.D. Cal. 2015) (*Okinawa Dugong III*). Dugong populations are often small and isolated, and live only in saltwater. *See generally* 68 Fed. Reg. 70185 (Dec. 17, 2003). Dugongs have long lifespans, but do not reproduce at a high rate, and because of their exclusively plant-based diet may face difficulty in moving to new locations to find food. *See id.* at 70186. The dugong largely depends on seagrass communities for survival and must stay close to the coastal habitats where seagrass grows. *See id.* (noting that the dugong's "close ties to the shore increase its chances of local extinction"). The same food sources are vulnerable to development on or soil runoff from coastal lands. *See, e.g.*, *Okinawa Dugong III*, 80 F. Supp. 3d at 997–98. Hunting and the fragility of the dugong's habitat have taken a toll on its numbers: the United States lists the dugong as an "endangered" species under the Endangered Species Act (ESA), the World Conservation Union considers the

---

[2] We note that the plaintiffs may face challenges in securing relief on the merits.

dugong "vulnerable," and Japan considers the dugong "critically endangered." *Id.* at 995.

Okinawa is the largest of the Ryukyu Islands in Japan. *See Okinawa Dugong v. Gates*, 543 F. Supp. 2d 1082, 1084 (N.D. Cal. 2008) (*Okinawa Dugong II*). Okinawa has a culture and local mythology distinct in some ways from the Japanese mainland. *See id.* The dugong is significant within traditional Okinawan culture, and continues to hold special significance for at least some Okinawans. *Okinawa Dugong III*, 80 F. Supp. 3d at 995.

At present, the Okinawa dugong population is the northernmost dugong population in the world. The population is small—perhaps as few as 50 in number, according to a 1997 estimate by the Mammalogical Study of Japan—and located in the waters to the east of Okinawa. *Id.* at 995. Because of its significance in Okinawan culture, the Japanese government has designated the Okinawan dugong population for protection under Japan's Law for the Protection of Cultural Properties. *See Okinawa Dugong II*, 543 F. Supp. 2d at 1084. Under Japanese law, therefore, the dugong is a "natural monument" or "cultural property." *Id.* The designation of the Okinawa dugong in this fashion provides the legal hook for the challenge at the heart of this appeal.

Plaintiffs-appellants are individuals and organizations, including the Center for Biological Diversity, the Turtle Island Restoration Network, the Japan Environmental Lawyers Federation, and the Save the Dugong Foundation (collectively, CBD). Among the plaintiffs-appellants are three individual Japanese citizens and four international environmental organizations. *Okinawa Dugong III*, 80 F. Supp. 3d at 995. The individual plaintiffs reside in Japan, and either live on Okinawa or guide dugong tours. *Id.* The

organizations have members who allege aesthetic and environmental interests in the Okinawa dugong.  *Id.*

## B. Diplomatic Framework for Okinawan Territory

The Government's interests in Okinawa include a longstanding security relationship with the Government of Japan.  The United States military has maintained a presence on Okinawa from the close of World War II up to the present day.  *Okinawa Dugong II*, 543 F. Supp. 2d at 1084.  The military has several bases in Okinawa.  *Okinawa Dugong III*, 80 F. Supp. 3d at 995–96.

"Today, as throughout our Nation's history, there is significant variation in the ownership status of U.S. military sites around the world."  *United States v. Apel*, 134 S. Ct. 1144, 1151 (2014).  The Government's operation of military bases in Japan involves "complex and long standing treaty arrangements."  *NEPA Coal. of Japan v. Aspin*, 837 F. Supp. 466, 467 (D.D.C. 1993).  From 1945 to 1972, the United States administered Okinawa, while Japan retained residual sovereignty.  *Okinawa Dugong III*, 80 F. Supp. 3d at 995.  In 1972, after years of negotiations, Japan and the United States entered into a new arrangement, restoring full Japanese sovereignty over Okinawa.  *See The Agreement Between the United States of America and Japan Concerning the Ryukyu Islands and the Daito Islands*, June 17, 1971, 23 U.S.T. 447 (the Okinawa Reversion Treaty); *Okinawa Dugong III*, 80 F. Supp. 3d at 995–96; *Okinawa Dugong II*, 543 F. Supp. 2d at 1084.  Under the Okinawa Reversion Treaty, the United States ceased to administer Okinawa and the island chains, which became a prefecture of Japan, but the United States retained "the use of facilities and areas in" Okinawa.  Okinawa Reversion Treaty, arts. I, ¶1, III, 23 U.S.T. 447; *see Okinawa Dugong II*, 543 F. Supp. 2d at 1084.  The United States continued to use Okinawan territory pursuant to two

additional agreements: the Treaty of Mutual Cooperation and Security Between the United States of America and Japan, Jan. 19, 1960, 11 U.S.T. 1632 (Security Treaty) and the Agreement Under Article VI of the [Security Treaty] Regarding Facilities and Areas and the Status of United States Forces in Japan, Jan. 19, 1960, 11 U.S.T. 1652 (Status of Forces Agreement). *See Okinawa Dugong II*, 543 F. Supp. 2d at 1084. The Security Treaty and Status of Forces Agreement set up a bilateral Security Consultative Committee (Consultative Committee) consisting of two principals from each of the two nations: Japan's Ministers of Defense and Foreign Affairs, and the United States' Secretaries of State and Defense. *Id.* at 1084–85. The Consultative Committee provides the forum for the two countries to consult when deciding what areas and facilities the United States will use for the defense purposes of the Security Treaty. *Id.* Article XXV of the Status of Forces Agreement also establishes a "Joint Committee"—separate from the Consultative Committee—with one representative from each nation. The functions of the two committees appear broadly similar.

In effect, this diplomatic framework is an agreement by the United States to provide security to Japan in exchange for the space to do so. To that end, Article III of the Status of Forces Agreement provides that "within the facilities and areas granted for use of the United States, the United States may take all measures necessary for the establishment, operation, safeguarding, and control of assigned facilities." This includes authority for the United States to control which individuals may access bases or facilities.

One longstanding base is Marine Corps Air Station Futenma (MCAS-Futenma), which supports Marine air operations. *Dugong v. Rumsfeld*, No. C 03-4350 MHP, 2005

WL 522106, at *1 (N.D. Cal. Mar. 2, 2005) (*Okinawa Dugong I*); *see Okinawa Dugong III*, 80 F. Supp. 3d at 996. MCAS-Futenma is located in Ginowan City, a site of growing urban development on Okinawa. *Okinawa Dugong III*, 80 F. Supp. 3d at 996. The growth and resulting change in surrounding conditions since the base was first established has led Japanese officials to express concern about the effect of the base on the health and safety of Japanese citizens. *Id*. American officials have agreed the base's current location poses challenges, and the two nations have engaged in efforts to relocate MCAS-Futenma since at least 1996. *Id.* The two countries' efforts have focused primarily on moving the Okinawa base to a less densely populated area.

Relocating MCAS-Futenma to a new site has taken a great deal of time and effort. *See, e.g.*, *Okinawa Dugong II*, 543 F. Supp. 2d at 1085–86. In 2006, the Consultative Committee released the "United States–Japan Roadmap for Realignment Implementation" (the Roadmap)—a bilateral executive agreement between the two nations that agreed on a plan of action for, among other things, relocation of MCAS-Futenma. *Id.* at 1086. The Roadmap sets forth that Japan will build a replacement military base, the Futenma Replacement Facility (FRF), near Camp Schwab, a military base already located adjacent to Oura and Henoko Bays. *Okinawa Dugong III*, 80 F. Supp. 3d at 996. Officials from the two nations selected the site after considering other potential base sites, including a sea-based location. *See Okinawa Dugong II*, 543 F. Supp. 2d at 1085–86.

Critical to the design of the FRF is a "V-shaped" set of runways built on top of landfill and extending into what are now the waters of the Oura and Henoko Bays. *Okinawa Dugong III*, 80 F. Supp. 3d at 996, 996 n.4. The runways are approximately 1600 meters long, with additional space for

"overrun." *Id.* at 996. After the 2006 Roadmap, no "serious" construction work occurred for the next seven years. *Id.* at 997. The FRF Project continued to be the subject of active diplomatic negotiations between Japan and the United States. *Id.* This included attention to the environmental impact of the base on eastern Okinawa. In Japan, government officials prepared a draft environmental impact statement (EIS) in 2009, and issued a final EIS in 2012. *Id.* The Japanese EIS included attention to "potential impacts on the dugong" from the runways and other FRF construction. *Id.* The Japanese EIS concluded that there would be no adverse effects on the Okinawa dugong from the FRF.

### C. Prior Decisions

CBD filed suit against the U.S. Department of Defense and the Secretary of Defense in his official capacity in September 2003. CBD filed its suit after it became clear that the likely site of the FRF might have effects on the Okinawa dugong, but prior to Japan and the United States entering into the 2006 Roadmap. In its complaint, CBD alleged that the FRF was a serious threat to the Okinawa dugong. CBD rested its claims on Section 402 of the NHPA and the APA. NHPA Section 402 requires that United States agency officials "take into account the effect" of any Government undertaking "[p]rior to the approval of any undertaking outside the United States that may directly and adversely affect" recognized cultural heritage sites or properties, "for purposes of avoiding or mitigating any adverse effect." 54 U.S.C. § 307101(e). CBD alleged that the Government had failed to "take into account" the effect the FRF might have on the Okinawa dugong, violating NHPA Section 402.

The Government first argued that NHPA Section 402 does not provide a cognizable basis for relief. The Government moved to dismiss on the basis that the dugong

was not "property" implicated by NHPA Section 402 and that the protected status of the dugong under Japanese law was not "equivalent" to being on the United States' National Register. *See Okinawa Dugong I*, 2005 WL 522106 at *6. The district court concluded that the NHPA *could* apply to the Government's design and construction of the FRF. *Id.* at *18. The district court found that Japan's cultural property protection law was equivalent to the United States' National Register, implicating NHPA Section 402, and that the dugong was a property the NHPA protects. *Id.* at *7–12. The district court also held that the NHPA applied extraterritorially because the statute on its face "explicitly demonstrate[d] Congress's intent that it apply abroad where a federal 'undertaking' promises to have direct or adverse effects on protected foreign properties." *Id.* at *18. The district court also ruled that relocation of MCAS-Futenma *could* be an "undertaking" for NHPA purposes, but that factual disputes precluded ruling on that question or on determining whether Japan's role made the action unreviewable under the act of state doctrine. *See id.* at *8, *10–11, *19–20. The parties had to develop the case further to allow for a conclusion on whether the FRF would actually have the potential to affect the dugong adversely and whether the Secretary of Defense had in fact discharged his NHPA Section 402 obligations. *Id.* at *16–18.

After this decision, Japan and the United States announced the Roadmap, and CBD filed a second amended complaint. After development of the record, the parties filed cross-motions for summary judgment.

In 2008, the district court ruled in favor of CBD on the cross-motions for summary judgment. *Okinawa Dugong II*, 543 F. Supp. 2d at 1112. The district court held that the individual plaintiffs and most of the organizations had

standing. *Id.* at 1096. The district court also dismissed a number of other threshold jurisdictional arguments from the Government, including arguments based on the lack of a "final agency action" under the APA, a failure of ripeness, the act of state doctrine, and Federal Rule of Civil Procedure 19's requirement to join necessary and indispensable parties (here, Japan). *Id.* at 1096–1100. The Government did not raise the political question doctrine at that time.

The district court then held that NHPA Section 402 applied to the Government because the FRF was a "federal undertaking" within the meaning of the statute and the undertaking might have adverse effects on the dugong. *Id.* at 1101–02. Having reached this conclusion, the district court interpreted the requirements of NHPA Section 402, which was an issue of first impression. *Id.* at 1102. The district court concluded that satisfying NHPA Section 402's process must include, at a minimum:

> (1) identification of protected property, (2) generation, collection, consideration, and weighing of information pertaining to how the undertaking will affect the historic property, (3) a determination as to whether there will be adverse effects or no adverse effects, and (4) if necessary, development and evaluation of alternatives or modifications to the undertaking that could avoid or mitigate the adverse effects. The person charged with responsibility for this basic process is the person with jurisdiction over the undertaking, and compliance with the process must occur before the undertaking is approved. In addition, a federal agency does not complete the take

into account process on its own, in isolation, but engages the host nation and other relevant private organizations and individuals in a cooperative partnership.

*Id.* at 1104.

The district court concluded that the Government had failed to comply with NHPA Section 402 because the "record contains no evidence that a single official from [the Government] with responsibility for the FRF has considered or assessed the available information on the dugong or the effects of the FRF." *Id.* at 1108.  This, in turn, was a violation of the APA, because it was agency action "unreasonably delayed and unlawfully withheld."  *Id.* at 1112 (citing 5 U.S.C. § 706(1)).  The district court ordered the Government to comply with NHPA Section 402.  *Id.*

The district court then ordered the case "held in abeyance until the information necessary for evaluating the effects of the FRF on the dugong is generated, and until defendants take the information into account for the purpose of avoiding or mitigating adverse effects to the dugong." *Id*.  The district court ordered the Government to submit additional information and documentation within 90 days,

describing [1] what additional information is necessary to evaluate the impacts of the FRF on the dugong; [2] from what sources, including relevant individuals, organizations, and government agencies, the information will be derived; [3] what is currently known or anticipated regarding the nature and scope of Japan's environmental assessment and whether that assessment will be sufficient for meeting defendants' obligations under the

NHPA; and [4] identifying the DOD official
or officers with authorization and
responsibility for reviewing and considering
the information for purposes of mitigation.

*Id*. The district court did not issue an appealable final order.

Eventually, in February 2012, without motion from either party, the district court administratively closed the case, citing reported obstacles in FRF construction. The district court instructed the parties to reopen the proceeding via letter when the FRF Project's likely outcome was more certain.

After the district court's 2008 decision in *Okinawa Dugong II* and the parties' attempts to comply with the district court's order, the U.S. Department of Navy engaged in an analysis pursuant to NHPA Section 402. Among other steps, the Navy (1) commissioned an independent study on the potential effects of the FRF on the Okinawa dugong, (2) engaged with the Government of Japan, (3) reviewed "multiple biological, environmental, and historical studies relating to the impact" of the project on the dugong, (4) reviewed Japan's EIS, including comments, (5) reviewed CBD's litigation materials, including the declaration of CBD's expert, and (6) consulted with sixteen experts in diverse disciplines, including some recommended by CBD. The Navy in a draft report also suggested a number of mitigation measures to the Government of Japan "to avoid possible adverse impacts to the Okinawa dugong." The Navy also identified mitigation measures to consider during operations of the base. The Government released its final report, the U.S. Marine Corps Recommended Findings (Marine Corps Findings), in April 2014. In its report, the U.S. Navy concluded that the FRF would have no adverse

impact on the Okinawa dugong population. The parties continue to dispute whether the Government actually discharged its NHPA Section 402 obligations.

The Government subsequently filed a notice of completion of the NHPA process for the FRF. The Government submitted the Marine Corps Findings to CBD, but did not provide the district court or CBD with an administrative record or underlying documentation.

In the interim, during 2013, the FRF construction project had "gained significant momentum." *Okinawa Dugong III*, 80 F. Supp. 3d at 997. The momentum included productive negotiations between the Government of Japan and the Governor of the Okinawa Prefecture. *Id.*

CBD subsequently filed a supplemental complaint that alleged that limited construction work was underway, a fact to which both parties agreed as of 2015. Since 2015, the FRF has had setbacks. Construction stopped in late 2015, before restarting, reflecting local political disputes relating to the FRF. Though construction appears to be ongoing at this time, there is no reason to think completion of the base is imminent.

## D. Instant Federal Court Proceeding

### 1. Claims for Relief

In its first supplemental complaint, CBD brought a single claim for declaratory and injunctive relief, with several subparts. CBD stated that the Government's failure to consult CBD as "interested parties" and failure to provide information to the public or seek public comment constituted violations of the "take into account" requirement of NHPA Section 402. CBD also alleged that failing to follow the

NHPA requirements violated the APA, 5 U.S.C. § 706(2)(A), (2)(D). Finally, CBD alleged that the Government's "conclusion that the construction and operation of the FRF will have no adverse effect on the Okinawa dugong" was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, within the meaning of the APA.

In its prayer for relief, CBD asked for (1) "a judgment declaring" several violations of NHPA Section 402 and of the APA; (2) an order setting aside the Marine Corps Findings; (3) an order barring the Government from proceeding with the FRF project, including derivative procedural steps like permitting and construction approval, until the Government "complies with section 402 of the NHPA"; and (4) costs and fees. We will refer to the request for a declaratory judgment and an order setting aside the Marine Corps Findings as CBD's "claims for declaratory relief" and the request for an order enjoining construction work as CBD's "claim for injunctive relief."

### 2. Motion to Dismiss and District Court Order

In September 2014, the Government moved to dismiss. At that point, the Government took the position that all of CBD's claims presented political questions, depriving the district court of jurisdiction.

In February 2015, the district court granted the motion to dismiss, but did so "on slightly different grounds than the Government request[ed]." The district court concluded that CBD's requested *injunctive* relief presented "nonjusticiable political questions." Specifically, the district court ruled that for the district court "to stop construction of a U.S. military facility overseas that has been approved by both the American and Japanese governments, and which is being

built by the Japanese on their own sovereign soil, runs afoul of the political question doctrine." On CBD's claims for declaratory relief, however, the district court declined to dismiss based on the political question doctrine, noting that these claims "arise in the context of a political *case*" but "do not present a non-justiciable political *question*."

The district court then concluded that even though the political question doctrine did not bar the claims for declaratory relief, CBD lacked standing to bring them because of "[t]he inability of this Court to fashion any injunctive or otherwise coercive relief to protect the dugong." The district court concluded specifically that CBD could not show that a favorable judicial decision was likely to redress its injuries. The district court, having resolved both the injunctive and declaratory claims, dismissed the suit with prejudice. CBD timely appealed.[3]

## II. Standard of Review

We review de novo whether CBD has Article III standing, *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 907 (9th Cir. 2011), and the dismissal for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), *Maronyan v. Toyota Motor Sales, U.S.A., Inc.*, 658 F.3d 1038, 1039 (9th Cir. 2011).

---

[3] The National Trust for Historic Preservation also moved for leave to participate as an amicus, which we granted.

### III. Order of Analysis

The district court dismissed CBD's claim for injunctive relief on political question grounds, and CBD's claims for declaratory relief for lack of standing.[4]

Lack of standing deprives this court of Article III jurisdiction, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998), and the presence of a political question likewise deprives this court of jurisdiction. *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 980 (9th Cir. 2007). "Article III generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).

We analyze separately CBD's standing for its declaratory and injunctive relief claims because "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). Likewise, the political question doctrine requires analysis on a claim-by-claim basis. *See Alperin v. Vatican Bank*, 410 F.3d 532, 547 (9th Cir. 2005) ("It is incumbent upon us to examine each of the claims with particularity."). We therefore have four discrete threshold issues before us: standing for declaratory relief, standing for injunctive relief, whether declaratory relief presents a political question, and whether injunctive relief presents a political question.

---

[4] The Government's actual compliance with NHPA Section 402 is not at issue on appeal because the Government did not move the district court for dismissal under Federal Rules of Civil Procedure 12(b)(6) or 56. *See infra*, Part V.

The district court recognized the need to engage in a fresh analysis of standing, and not to rely on the facts as they stood at the outset of the litigation. *See Quinn v. Anvil Corp.*, 620 F.3d 1005, 1012 (9th Cir. 2010).  The district court, however, took a roundabout path to the standing question. Rather than confronting standing first, the district court, as noted above, discussed the political question doctrine for declaratory relief (finding no political question), then the political question doctrine for injunctive relief (finding the injunctive relief claim barred for presence of a political question), and then finally standing for declaratory relief (finding no standing for declaratory relief).

We take a different approach.  *No GWEN All. of Lane Cty., Inc. v. Aldridge*, 855 F.2d 1380, 1382 (9th Cir. 1988) ("When both standing and political question issues are before the court, the court should determine the question of standing first.").  We begin with standing for declaratory relief.

## IV. Discussion of Declaratory Relief

### A. Standing

CBD alleges a procedural injury based on the NHPA, relying on the APA.[5]  Three elements form the "'irreducible

---

[5] CBD brings claims based on the NHPA.  NHPA "is a procedural statute requiring government agencies to 'stop, look, and listen' before proceeding with agency action." *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of the Interior*, 608 F.3d 592, 610 (9th Cir. 2010).  The default approach with procedural statutes of this variety is to recognize no private right of action, and to require a plaintiff to proceed under the APA.  5 U.S.C. § 702; *see San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1097–98 (9th Cir. 2005); *Sierra Club v. Penfold*, 857 F.2d 1307, 1315 (9th Cir. 1988).  Plaintiffs who bring a cause of

constitutional minimum' of standing" to file suit in federal court. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* CBD bears the burden to establish the elements of standing, which, when challenged in a motion to dismiss, are judged based on the allegations in its complaint.  *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014).

### 1. Injury-in-Fact

A plaintiff shows a procedural injury-in-fact "when a procedural requirement has not been met, so long as the plaintiff also asserts a 'concrete interest' that is threatened by the failure to comply with that requirement."  *City of*

---

action under another provision of NHPA, Section 106, must do so under the APA.  *San Carlos Apache Tribe*, 417 F.3d at 1098.  The relevant provision of NHPA for this appeal, Section 402, requires that

> Prior to the approval of any undertaking outside the United States that may directly and adversely affect a property that is on the World Heritage List or on the applicable country's equivalent of the National Register, the head of a Federal agency having direct or indirect jurisdiction over the undertaking shall take into account the effect of the undertaking on the property for purposes of avoiding or mitigating any adverse effect.

54 U.S.C. § 307101(e).  Nothing in NHPA Section 402 suggests the creation of any separate private right of action.  NHPA's procedural character therefore requires that CBD file suit under the APA.  *San Carlos Apache Tribe*, 417 F.3d at 1096–97 (noting default presumption of no private right of action outside the APA).

*Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004) (quoting *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969–70 (9th Cir. 2003)). Congress cannot create an injury-in-fact or relax the injury-in-fact requirement. *See Spokeo*, 136 S. Ct. at 1547–48; *see also Sausalito*, 386 F.3d at 1197.

A "concrete interest" implicated by a procedural requirement may reflect "aesthetic, conservational, and recreational" values and does not need to be an economic harm. *Sierra Club v. Morton*, 405 U.S. 727, 738 (1972).

Here, CBD alleges concrete aesthetic interests in the enjoyment of the Okinawa dugong. Two of the individual named plaintiffs also allege concrete economic interests through their tourism business. CBD also points to a procedural requirement, NHPA Section 402, and alleges the Government did not satisfy this requirement. The threat to CBD's interests by the Government's failure to satisfy the procedural requirement is clear because the requirement directly relates to "the effect of the undertaking on the property" within the meaning of NHPA Section 402. 54 U.S.C. § 307101(e). CBD therefore satisfies the first element of Article III standing. *See Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 779 (9th Cir. 2006) (citing *Friends of the Earth*, 528 U.S. at 183) (finding injury-in-fact requirement met where plaintiffs pointed to use of affected area and activity that will lessen enjoyment of use).

## 2. Causation

The next requirement of standing is whether the injury in question is "fairly traceable" to the conduct of the Government. The conduct of the Government for purposes of CBD's challenge is the Government's failure to "take into account" the effects of the FRF project on the dugong prior

to the approval of a federal undertaking. A claim of procedural injury affects the standing analysis, and can relax some requirements. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 517–18 (2007). Where, as here, claims rest on a procedural injury, "the causation and redressability requirements are relaxed." *California ex rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 790 (9th Cir. 2014) (quoting *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001)).

Causation in a NHPA case involves the take-into-account process for a federal undertaking. When analyzing the relevant undertaking in this case, we adopt the following description by the district court:

> DOD does not violate the NHPA by virtue of its bilateral participation in the design, site selection, construction and operation of a military facility that threatens a protected property. The NHPA violation arises instead from DOD's failure to take into account information relevant for making a determination as to whether the military facility will adversely affect the dugong and if so, how those effects may be avoided or mitigated. In other words, the challenged activity is not the undertaking itself, but *the process by which the effects of the undertaking are considered and assessed*.

*Okinawa Dugong II*, 543 F. Supp. 2d at 1095 (emphasis added). In other words, we focus on causation by reference to the required NHPA *process*. CBD is not challenging entry into the 2006 Roadmap, or any specific approval, but whether the Government conducted the required take-into-

account process.  When, as of 2008, CBD was asking the Government to engage in the take-into-account process, its standing to challenge agency inaction was clear.  At this stage in the litigation, the question is whether the action the Government took—the process detailed in and leading up to the Marine Corps Findings—satisfied NHPA Section 402 and APA standards for agency action.  The relationship between causation and adverse effects remains intact, and the inquiry remains focused clearly on the process and not the result.  CBD has shown causation and satisfied the second "irreducible" element of Article III standing.

### 3. Redressability

The final standing question is whether CBD can establish redressability.  It was on this ground that the district court in the decision under appeal concluded that CBD lacked standing to bring its claims.

The plaintiff must show it is likely the injury "will be redressed by a favorable decision." *Friends of the Earth*, 528 U.S. at 181.  "Plaintiffs alleging procedural injury can often establish redress[a]bility with little difficulty, because they need to show only that the relief requested—that the agency follow the correct procedures—may influence the agency's ultimate decision of whether to take or refrain from taking a certain action." *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226–27 (9th Cir. 2008).

In a project with many moving pieces, as well as several stops and starts, the details of the base's *construction* and *operation* are susceptible to potential alteration and modification by the take-into-account process.  Indeed, the take-into-account process of NHPA Section 402 envisions the process' goal to be "avoiding or mitigating any adverse

effect," 54 U.S.C. § 307101(e), which implies that an undertaking will still be carried out.

The Government, having concluded in the Marine Corps Findings that no adverse effects are forthcoming, opposes standing based on the idea that no mitigation efforts are possible. The Government, for instance, notes practical obstacles to changing flight paths, storm water management plans, or nighttime illumination. But this does not defeat standing, given the allegations in the operative complaint. If the Government has reached its conclusions about effects and mitigation after a sound NHPA Section 402 process, then it has complied with NHPA Section 402; the claim fails not for lack of standing but on the merits. If the Government has not followed NHPA Section 402, then these arguments are unavailing, because the underlying determinations about effects and mitigation lack validity.

In concluding CBD lacked standing, the district court relied heavily on our decision in *Salmon Spawning*, 545 F.3d 1220. In *Salmon Spawning*, the State Department sought to enter into a treaty with Canada regarding fisheries in the waters off the Pacific Northwest (Fisheries Treaty). *Id.* at 1223. The State Department's action triggered a consultation requirement under the ESA, whereby the State Department had to request advice from either the National Marine Fisheries Service (NMFS) or the Fish and Wildlife Service on the likelihood of the action threatening endangered species with extinction. *Id.* The United States would not implement the Fisheries Treaty unless the federal government had discharged relevant consultation requirements under domestic statutory law. *See id.* That consultation requirement required the NMFS to issue a biological opinion (BiOp), which in relevant part concluded that the Fisheries Treaty would not jeopardize any

endangered species. *See id.* at 1223–24. The plaintiffs challenged the BiOp as arbitrary and capricious and claimed that implementation of the Fisheries Treaty was unlawful without a legally adequate consultation. *Id.* at 1224. The plaintiffs sought declaratory and injunctive relief. *See Salmon Spawning & Recovery All. v. Gutierrez*, No. C05-1877RSM, 2006 WL 2620421, at \*2 (W.D. Wash. Sept. 12, 2006), *aff'd in part, rev'd in part and remanded*, 545 F.3d 1220.

In *Salmon Spawning*, we characterized the claim as a challenge to "the biological foundation for the Treaty." 545 F.3d at 1225. We concluded that "if the groups were successful in establishing that NMFS failed to comply with the procedural requirements of ESA § 7 in deciding whether the United States' entrance into the Treaty would jeopardize listed species, the procedurally flawed consultation and defective BiOp could theoretically be set aside." *Id.* at 1226. But we immediately noted that "a court could not set aside the next, and more significant, link in the chain—the United States' entrance into the Treaty. While the United States and Canada can decide to withdraw from the Treaty, that is a decision committed to the Executive Branch, and we may not order the State Department to withdraw from it." *Id.* On that basis, we concluded that the plaintiffs could not show redressability, even under the relaxed showing necessary for a procedural injury, because "[t]he agency action that the BiOp authorized was the United States' entrance into the Treaty" and the court had no power to disturb the entrance into the Fisheries Treaty. *Id.* at 1227.

*Salmon Spawning* suggests that to the extent CBD seeks declaratory relief aimed at challenging the 2006 Roadmap, or the decision to initiate the FRF Project, CBD lacks standing. Indeed, perhaps for this reason, the Government

treats CBD's challenge in this case as akin to the effort to invalidate the Fisheries Treaty in *Salmon Spawning*.  As noted above, however, CBD's claim concerns the take-into-account process of NHPA Section 402, *Okinawa Dugong II*, 543 F. Supp. 2d at 1095, and CBD does not seek to invalidate any specific decision.  Instead, CBD is seeking a declaration that the Government did not take into account the effects of the FRF project on the dugong, as the Government was required to do under NHPA Section 402.

Further, the district court overlooked a more limited challenge by the *Salmon Spawning* plaintiffs that we *did* sustain: a claim that the NMFS was obligated to "reinitiate" its analysis and consultation in light of new data.  We concluded that Article III standing was satisfied, including redressability, because the fact that

> it is uncertain whether reinitiation will ultimately benefit the groups (for example, by resulting in a "jeopardy" determination) does not undermine their standing. The asserted injury is not too tenuously connected to the agencies' failure to reinitiate consultation. And a court order requiring the agencies to reinitiate consultation would remedy the harm asserted. Unlike the other claims, this claim is a forward-looking allegation whose remedy rests in the hands of federal officials and does not hinge on upsetting the Treaty.

*Salmon Spawning*, 545 F.3d at 1229 (citation omitted). Here, CBD's claim is similarly forward-looking and "does not hinge on upsetting" the 2006 Roadmap or the FRF Project.  It is merely seeking that the Government discharge

a statutory procedural requirement.  If the Government has failed to do so, then the court can remedy the defect by ordering the Government to comply with its statutory obligations.

*Mayfield v. United States* also does not provide a basis to defeat CBD's standing here.  599 F.3d 964 (9th Cir. 2010). The plaintiff in *Mayfield* sought declaratory relief that aspects of the Foreign Intelligence Surveillance Act (FISA) violated the Fourth Amendment of the United States Constitution.  599 F.3d at 966.  *Mayfield* is distinguishable for three reasons.  First, Mayfield's claim was not procedural in nature, meaning that the redressability analysis in his case was not characteristic of procedural injuries.  CBD's claims, as discussed, are procedural.  Second, Mayfield's relief was limited to declaratory relief because of a settlement.  *Id.* at 968 ("The parties agreed that the sole relief that Mayfield could seek or that the court could award with regard to this claim would be a declaratory judgment.").  We concluded, "[T]he only relief that would redress this alleged Fourth Amendment violation is an injunction requiring the government to return or destroy such materials," which was not within the scope of what Mayfield could seek.  *Id.* at 972. CBD has not bargained away its right to seek injunctive relief, and for procedural injuries the lack of injunctive relief is not fatal to standing for declaratory relief.  *See Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015).  Finally, in *Mayfield*, the likelihood of redress seemed minimal because there was no indication that the Government would "return the materials of its own volition, as it is under no legal obligation to do so, and has stated in its brief that it does not intend to take such action."  599 F.3d at 972.  But while the redress sought in *Mayfield* related to information the Government had no legal obligation to delete or return, here the redress relates to a

legal requirement binding on the government, NHPA Section 402. A declaratory judgment finding that the Marine Corps Findings do not satisfy NHPA Section 402 *would* impose a legal obligation on the Government because a procedural requirement would stand unfulfilled. Unlike *Mayfield*, where a ruling would be of "no direct consequence" to the plaintiff, here CBD's claims for declaratory relief, challenging the NHPA Section 402 process, are something a legally adequate NHPA Section 402 process could address.

CBD in its complaint alleges that the Government would discharge its obligations under NHPA Section 402 by taking steps that include:

> a. Producing, gathering, and adequately considering the necessary information for taking into account all the effects of the FRF on the Okinawa dugong and for determining whether mitigation or avoidance measures are necessary and possible;

> b. Making this information and other documentation relevant to the section 402 "take into account" process available to the public; and

> c. Consulting with all interested parties, including Plaintiffs, and inviting public participation in the section 402 process.

CBD alleges the Government has not taken these steps. An adequate process will benefit CBD, even for an ongoing project. CBD therefore has standing to pursue these claims.

Further, the relevant controversy has not yet concluded. The Government asserts that the Japanese government "has completed its environmental analysis and finalized its stormwater management design, and is in the process of constructing the FRF." But the FRF project has seen stops, starts, and modifications throughout its history. We cannot assume that the project is "finalized" and that a new NHPA Section 402 analysis—if required—would not lead to changes, minor or major, to the details of the construction of the FRF. We especially cannot assume that it would affect details of the *operation* of the FRF, once completed. As we noted in a case involving a different provision of NHPA, we should not "pre-judge the outcome of any consultations" that may take place. *Tyler v. Cuomo*, 236 F.3d 1124, 1134 (9th Cir. 2000). "At this point . . . it is impossible for us to know with any degree of certainty just what the end result of the NHPA process would be," and under those circumstances we avoid "shortcutting the process which has been committed in the first instance to the responsible federal agency." *Id.* (quoting *Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*, 948 F.2d 1436, 1446–47 (5th Cir. 1991)) (noting the need to consider a range of outcomes and not merely a binary between no change or a completely altered approach).

## 4. Conclusion

We conclude that CBD[6] has standing to pursue declaratory relief, limited to whether the Government's evaluation, information gathering, and consultation process

---

[6] CBD and other organizational plaintiffs derive their standing from their members, and those members allege similar interests to the individual plaintiffs, meaning standing is satisfied for all plaintiffs. *See Friends of the Earth*, 528 U.S. at 181.

pursuant to NHPA Section 402 discharged the Government's obligations under the NHPA and otherwise satisfied the requirements of the APA.

We turn now to whether CBD's claims for declaratory relief present a political question.

## B. Political Question Doctrine

"It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *see United States v. Nixon*, 418 U.S. 683, 703 (1974) (noting that *Marbury*'s pronouncement has been "unequivocally reaffirmed" in "many decisions" of the Supreme Court since it was first written). Nonetheless, the duty is not a license for courts to issue opinions on every legal issue that may come before them. For instance, the prohibition "that the federal courts will not give advisory opinions"—called "the oldest and most consistent thread in the federal law of justiciability"— predates even the holding of *Marbury*. *See Flast v. Cohen*, 392 U.S. 83, 96 (1968) (quoting C. Wright, Federal Courts 34 (1963)). Elsewhere, in *Marbury* itself, Chief Justice Marshall recognized that

> The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.

*Marbury*, 5 U.S. (1 Cranch) at 170; *see Alperin*, 410 F.3d at 544. *Marbury*'s reference to questions "in their nature

political" was an early glimpse of the "political question doctrine." Today, the "political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986). By its nature, the doctrine is a "narrow exception" to the judiciary's "responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194–95 (2012) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)).

"The nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962). Traditionally, courts determining whether a case presents a political question have consulted the following six factors:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious

> pronouncements by various departments on
> one question.

*Id.* at 217. The Supreme Court recently has placed more weight on the first two factors: (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department" or (2) "a lack of judicially discoverable and manageable standards for resolving" the question. *Zivotofsky*, 566 U.S. at 195 (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)) (analyzing only the first two *Baker* factors before concluding case did not present a political question); *see Nixon*, 506 U.S. at 228 (citing only to the first two *Baker* factors).

Dismissal because of the presence of a political question is appropriate if "one of these [six] formulations is inextricable from the case at bar." *Baker*, 369 U.S. at 217. This analysis requires close attention to the particular claims presented in each case. *See Corrie*, 503 F.3d at 982. Here, the claims seeking declaratory relief turn on interpretation of NHPA Section 402. If a political question bars CBD's claims for declaratory relief, then that question must be inextricable in some way from the interpretation and application of NHPA Section 402.[7]

---

[7] On appeal, the Government notes its continuing objection to the 2005 and 2008 orders of the district court, arguing that the legal conclusions are not even the "law of the case" and reserving the right to move for reconsideration or further appellate review. Subject to any waiver considerations, the Government may still be able to challenge these orders' conclusions regarding: (1) a procedural right existing in NHPA Section 402, (2) NHPA Section 402 applying extraterritorially, and (3) the dugong's protection under Japan's Law for the Protection of Cultural Properties being equivalent to inclusion on the United States' National Historic Register. Nonetheless, we do not construe the

## 1. First *Baker* Factor—Textual Commitment to Another Branch

The district court found that CBD's declaratory claims challenging the Government's compliance with NHPA Section 402 did not implicate the first *Baker* factor, "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker*, 368 U.S. at 217. We agree with the district court that evaluating CBD's declaratory claims requires us "to apply the standards of the APA to the process employed by the [Government], not pass judgment on the wisdom of the Executive's ultimate foreign policy or military decisions." *Okinawa Dugong III*, 80 F. Supp. 3d at 1005. For that reason, we conclude that no political question is present under the first *Baker* factor.

To the extent that one considers the first *Baker* factor to implicate a broader deference to the political branches' judgment in foreign affairs, that deference cuts in both

Government to be challenging the district court's 2005 and 2008 rulings at this time, nor would it be proper to do so: the conclusions in those orders relate to the merits, and the motion ruled on here, filed under Rule 12(b)(1), solely concerns subject-matter jurisdiction. Accordingly, we assume for purposes of the appeal that NHPA Section 402 provides a procedural right, applies extraterritorially, and has relevance to the effects of the FRF on the dugong.

Further, we note that NHPA's extraterritorial application seems logical, in light of its purpose. *See* H.R. Rep. 96-1457, at 43 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6378, 6406 (enacting NHPA Section 402 as part of the United States' obligations under the U.N. Convention Concerning the Protection of the World Cultural and Natural Heritage, which sought "to establish an effective system of collective protection of the cultural and natural heritage of outstanding universal value"). Any invocation of NHPA Section 402 before the courts would implicate some aspect of foreign affairs, and few acts of the United States overseas do not relate to the nation's interests.

directions.  Here, Congress has expressed its intent regarding an aspect of foreign affairs.  In this way, a reviewing court evaluating the Government's compliance with NHPA Section 402 is "not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United States policy . . . should be."  *Zivotofsky*, 566 U.S. at 196.  Instead, a court must engage in the "familiar judicial exercise" of reading and applying a statute, conscious of the purpose expressed by Congress.  *See id.*

As further support for our conclusion, consider *Japan Whaling Association*, where the Supreme Court faced the question of whether the Secretary of Commerce had to certify publicly that Japan had diminished the effectiveness of an international convention on whaling.  478 U.S. at 223. The Court considered whether the question might be political in nature, and concluded that the question's clear political *implications* did not bring it beyond review:

> [T]he courts have the authority to construe treaties and executive agreements, and it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts. . . . We are cognizant of the interplay between these Amendments and the conduct of this Nation's foreign relations, and we recognize the premier role which both Congress and the Executive play in this field. But under the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones.

*Id.* at 230.

Finally, in its briefing, the Government seems to veer close to arguing that NHPA Section 402 is an unconstitutional infringement on executive power. For instance, discussing injunctive relief, the Government invokes *Earth Island Institute v. Christopher*, 6 F.3d 648, 653 (9th Cir. 1993), where we held the statute in question to be an *unconstitutional* infringement on the President's powers of diplomatic negotiation. But even if this were the Government's argument, it would be of no relevance to our political question analysis because whether the statute is an unconstitutional infringement on the President's power is a merits issue, not an issue of subject-matter jurisdiction. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083 (2015) (*Zivotofsky II*) (analyzing respective constitutional powers of the executive and Congress, *after* first having determined that the case did not present a political question).

We hold that the first *Baker* factor does not bar the claims for declaratory relief.

### 2. Second *Baker* Factor—Judicially Manageable Standards

The second *Baker* factor concerns the lack of "'judicially discoverable and manageable standards.'" *Alperin*, 410 F.3d at 553. The Government relies on this factor to challenge our competence to decide CBD's claims. Acknowledging that the interpretation of statutes is a "familiar judicial exercise," *Zivotofsky*, 566 U.S. at 196, the Government nonetheless argues that NHPA Section 402 "provides no substantive standard by which to review either the procedures the Secretary used to consider the impacts of the FRF or the substance of his conclusion." Specifically, the

Government argues, "legal tools are lacking here, because there are no applicable statutory or regulatory standards by which a court can review the Secretary's implementation of Section 402 in this case."

This argument is unconvincing.  For one, a statute does not need a regulatory gloss to have substantive standards. Courts can interpret statutes without the aid of regulatory interpretation.  *See POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2236 (2014) (noting that in "a statutory interpretation case . . . the Court relies on traditional rules of statutory interpretation. That does not change because the case involves multiple federal statutes. Nor does it change because an agency is involved. Analysis of the statutory text, aided by established principles of interpretation, controls.") (citations omitted).  Federal agencies retain a great deal of power to interpret ambiguous statutes.  *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (holding that an agency's interpretation of an ambiguous statute continues to receive deference even when that interpretation is "inconsistent with its past practice"). We are unaware, however, of any requirement that a statute must have an agency interpretation before judicial construction is possible.  Further, as CBD points out, courts decided cases involving NHPA Section 106, a similar provision relating to domestic undertakings,[8] even before

---

[8] In the absence of case law governing NHPA Section 402, the more developed regime of Section 106 is a useful comparison point.  NHPA Section 106 applies to federal domestic "undertakings" a set of procedural requirements broadly similar to those applied to federal "undertakings" overseas by NHPA Section 402.  *See* 54 U.S.C. § 306108.  In this Circuit, plaintiffs must bring procedural violations of NHPA Section 106 under the APA, and we have recognized Section 106 to provide procedural rights.  *San Carlos Apache Tribe*, 417 F.3d at 1099.  Section 106 also has a detailed set of regulations, 36 C.F.R.

promulgation of any implementing regulations for Section 106. *E.g.*, *D. C. Fed'n of Civic Ass'ns v. Adams*, 571 F.2d 1310, 1313 & n.8 (4th Cir. 1978) (applying Section 106 without looking to any regulations); *Edwards v. First Bank of Dundee*, 534 F.2d 1242, 1245 (7th Cir. 1976) (noting "substantive provisions" of Section 106). A court analyzing the Government's compliance with NHPA Section 402 also has the aid of a clear legislative purpose and treaty framework to aid in the effort to craft appropriate standards. In this situation, "courts are capable of granting relief in a reasoned fashion" to plaintiffs. *Alperin*, 410 F.3d at 553. The second *Baker* factor does not bar CBD's claims for declaratory relief.

### 3. Other *Baker* Factors

As noted above, the remaining *Baker* factors, 369 U.S. at 217, are usually less significant than the first two. The district court analyzed each of these factors, and concluded that none rendered CBD's declaratory relief inextricable from a political question. We agree.

The case does not implicate the third *Baker* factor, "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion," for essentially the same reasons as the second *Baker* factor: a federal court has standards to guide its resolution of the dispute. The fourth *Baker* factor, "the impossibility of a

§ 800.1–16, first promulgated in 1974. *See Okinawa Dugong II*, 543 F. Supp. 2d at 1088–89. The statutory text of Section 106 imposes more rigorous requirements than Section 402, including an opportunity for comment by the Advisory Council on Historic Preservation. *See* 54 U.S.C. § 306108. Section 106 also has a robust set of regulations, with many consultation requirements, while Section 402 has no implementing regulations. *Okinawa Dugong II*, 543 F. Supp. 2d at 1089.

court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government," is unavailing because to abstain from giving effect to a federal statute is less respectful to Congress than reviewing the executive's compliance.  The sixth *Baker* factor, "the potentiality of embarrassment from multifarious pronouncements by various departments on one question," is also not present, because the accuracy of the Marine Corps Findings and the adequacy of process under NHPA Section 402 are separate questions.  Finally, we agree with the district court that "[d]eclaratory relief would not be directed towards criticizing the policy decisions of the American and Japanese governments to construct the new base; rather, if granted, it would hold only that statutory procedures were not followed." *Okinawa Dugong III*, 80 F. Supp. 3d at 1011.

The fifth *Baker* factor, "an unusual need for unquestioning adherence to a political decision already made," is in some ways the most compelling factor in the circumstances of this case.  The Government has expended considerable effort to build the FRF over decades.  We have no basis to question the wisdom of that effort, or to seek to frustrate our nation's foreign policy.  *See Coleman v. Miller*, 307 U.S. 433, 455 (1939) (noting the "considerations of extreme magnitude" characteristic of the nation's "conduct of foreign relations").  Enforcing NHPA, however, does not intrude on foreign policy judgment, and it would be a "rare case" where prudential considerations of this kind might bar judicial resolution.  *Zivotofsky*, 566 U.S. at 207 (Sotomayor, J., concurring).  Judicial scrutiny to enforce the obligations of binding domestic law is unlikely to alter or damage our nation's longstanding bond with Japan.  The Government's efforts to comply with the district court's 2008 order suggest that the amicable relationship between Japan and the United States can withstand scrutiny or reassessment of operational

details, even years after the two nations entered into the Roadmap.  The Government itself notes that the Marine Corps Findings submitted to CBD "are the product of a robust process that included active engagement with the Government of Japan and consideration of multiple studies, reports, and comments, including the Government of Japan's [environmental impact assessment], the comments collected by the Government of Japan, and the declaration of CBD's expert."

The Government emphasizes the care taken in every aspect of negotiations regarding the FRF Project.  The Government points to "over twenty years of negotiation, design, and study" before construction commenced.  Rather than counseling in favor of "unquestioning adherence," however, the Government's painstaking efforts render it *more* questionable why the NHPA take-into-account process is an undue burden.  There is no reason to think that compliance with the NHPA process is beyond the Government's ability, especially when the Government argues at length that it has provided a good-faith analysis of the environmental impacts of the new base.  To declare that courts cannot even look to a statute passed by Congress to fulfill international obligations turns on its head the role of the courts and our core respect for a co-equal political branch, Congress.  Interpreting and applying NHPA Section 402 does not prevent the military from planning and building bases.  It requires only that the executive take into account certain procedural obligations, required by Congress, before it takes steps forward.  The courts may then look to whether the executive complied with its obligations.  We may consider national security concerns with due respect when the statute is used as a basis to request injunctive relief.  This is not a grim future, and certainly no grimmer than one in

which the executive branch can ask the court for leave to ignore acts of Congress.

### 4. Conclusion

The Government's core argument is that to allow CBD to proceed with its suit would "necessarily require the judicial branch . . . to question the political branches' decision" in completing the FRF.  *Corrie*, 503 F.3d at 982.  The district court rejected this argument, and was correct to do so.   CBD's claims for declaratory relief present no political question preventing judicial review.

### V. Discussion of Claim for Injunctive Relief

We turn now to CBD's claim for injunctive relief.  Here, the district court concluded only that the claim presented a political question, and did not discuss standing.  We begin with CBD's standing for injunctive relief.  *See Aldridge*, 855 F.2d at 1382.

### A. Standing

As noted above, "a plaintiff must demonstrate standing separately for each form of relief sought."  *Friends of the Earth*, 528 U.S. at 185.  For the first two elements, injury-in-fact and causation, *Spokeo*, 136 S. Ct. at 1547, the analysis for injunctive relief mirrors the previous analysis of declaratory relief.  This correspondence is natural when the declaratory and injunctive claims emerge out of the same underlying allegations and violations.  CBD alleges it has suffered a procedural injury to its concrete interests, and that the injury is traceable to the Government's conduct.  CBD thus meets the injury and causation requirements to have standing for its claim seeking injunctive relief.

Like in the claims for declaratory relief, the redressability requirement is "relaxed" because the injury-in-fact is procedural. *Cantrell*, 241 F.3d at 682. Redressability, however, is a more relevant difference when comparing declaratory and injunctive relief because redressability depends on the relief envisioned.

Here, CBD seeks injunctive relief via an order that the Government "not undertake any activities in furtherance of the FRF project, including granting permits or approvals for contractor entry to Camp Schwab and/or the proposed FRF project area, and that [the Government] rescind any such permits or approvals already granted, until it complies with section 402 of the NHPA[.]" The grant of injunctive relief in this case will result in (1) an adequate NHPA Section 402 process with (2) some likelihood of protecting CBD's interests. Courts often exercise power under the APA to grant injunctive relief analogous to the halt that CBD requests. *E.g.*, *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 815 (9th Cir. 1999) (per curiam) (enjoining further activities on specific area of land until the Forest Service discharged its obligations under NHPA and the National Environmental Protection Act, in part because of ongoing damage). Accordingly, CBD has satisfied the requirement of redressability. We hold that CBD has standing for its injunctive claim.

## B. Political Question Doctrine

The framework for analyzing whether CBD's claims for declaratory relief presented a political question also applies to injunctive relief. The district court, analyzing the *Baker* factors, concluded that CBD's claim for injunctive relief presented a political question. The district court rested its conclusion primarily on the second *Baker* factor, regarding the lack of judicially manageable standards. The district

court also concluded that CBD's claim likely presented a political question under the first *Baker* factor, a power belonging to another branch. The district court also cited to the fourth, fifth, and sixth *Baker* factors: respect for coordinate branches, the need for unquestioning adherence to a decision already made, and the potential embarrassment of varying pronouncements by several departments on one question. We consider all the *Baker* factors on appeal.

The nature of the remedy sought is relevant to considering whether any of the *Baker* factors are inextricable from CBD's claim. To obtain injunctive relief after prevailing on the merits, CBD would be required to show

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1184 (9th Cir. 2011) (per curiam) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). We have suggested that "because the framing of injunctive relief may require the courts to engage in the type of operational decision-making beyond their competence and constitutionally committed to other branches, such suits are far more likely to implicate political questions." *Koohi v. United States*, 976 F.2d 1328, 1332 (9th Cir. 1992).

## 1. First *Baker* Factor—Textual Commitment to Another Branch

When confronting a statutory question touching on subjects of national security and foreign affairs, a court does not adequately discharge its duty by pointing to the broad authority of the President and Congress and vacating the field without considered analysis.  *See Baker*, 369 U.S. at 211 (rejecting "sweeping statements to the effect that all questions touching foreign relations are political questions"); *see also Zivotofsky*, 566 U.S. at 201 (noting judicial capacity and responsibility to engage in "careful examination of the textual, structural, and historical evidence put forward by the parties regarding the nature of the statute").  The inquiry under the first *Baker* factor requires far more specificity about the nature and source of the power exercised.  *See Baker*, 369 U.S. at 211 ("[W]hether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation.").

Here, the district court noted that decisions to "establish" a military base are generally unreviewable.  But it is not necessary to review the establishment or location of the base to consider whether to enjoin the Government from undertaking any activities in furtherance of the FRF project until it complies with NHPA Section 402.  The district court erred by assuming otherwise.  Like CBD's claims for declaratory relief, the relevant question for CBD's claim for injunctive relief is compliance with NHPA Section 402.  After all, a court would have to find a violation of NHPA Section 402 prior to granting the injunctive relief CBD requests.

Once a court finds a violation of a statutory requirement, the relief that follows is to vindicate what Congress has directed.  The question then presented, whether injunctive relief *should* issue, is one courts often resolve after determining that a procedural violation took place.  *E.g.*, *Montana Wilderness Ass'n v. Connell*, 725 F.3d 988, 1010 (9th Cir. 2013) (reversing summary judgment to defendant on a NHPA claim, and remanding with instructions to grant injunctive relief to plaintiffs).  Appropriate injunctive relief arises from the act of statutory interpretation, and does not require the courts to engage in "operational decision-making beyond their competence."  *See Koohi*, 976 F.2d at 1332.

Our chief concern under the first *Baker* factor is to avoid answering a question committed to a coordinate political department.  *See Zivotofsky*, 566 U.S. at 195; *Nixon*, 506 U.S. at 228; *Baker*, 369 U.S. at 217.  In this case, determining whether to grant injunctive relief would not require a court to answer this kind of question.  Whether an injunction should issue to remedy a violation of the procedural requirements imposed by NHPA Section 402 is a question constitutionally committed to the judiciary, not to the political branches, and a district court may exercise its equitable discretion to "order that relief it considers necessary to secure prompt compliance" with an act of Congress.  *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).  To the extent a conflict arises from diverging intentions by the executive and Congress, we are competent to police these kinds of disputes, even when they implicate foreign policy matters.  *Zivotofsky*, 566 U.S. at 201.

We conclude that there is no political question present under the first *Baker* factor.

## 2. Second *Baker* Factor—Judicially Manageable Standards

The district court principally relied on the second *Baker* factor.  On appeal, CBD argues that to affirm the district court's reasoning would adopt, in practice, "[a] *per se* rule that any request for injunctive relief is nonjusticiable when foreign affairs or national security are at stake."  We agree that any similar per se rule would be out of step with Supreme Court precedent, and we reject the district court's conclusion that CBD's claim for injunctive relief implicates the second *Baker* factor.

In *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 26 (2008), the Supreme Court applied the four-part standard for preliminary injunctive relief to determine whether the use of sonar in training exercises by Navy submarines was a strong enough government interest to outweigh harm to whales and other marine mammals that plaintiffs studied and observed.  555 U.S. at 26; *see also id.* at 20–31.  The use of sonar was "essential to national security"—much like the weighty security interests the Government asserts in this case.  Harm to marine mammals presented a similar set of non-economic interests.  The Court found that the balance of the equities was not a "close question" and ruled in the Government's favor.  *Id.* at 26.  Critically, however, the Supreme Court did not hold that the inquiry was a political question; it merely applied the injunctive analysis and ruled against the plaintiffs on the merits.

When a court exercises its equitable discretion to weigh the considerations of injunctive relief for a plaintiff, whether granting or denying that relief, the exercise undoubtedly "can fully protect the range of public interests at issue" in the proceedings.  *Weinberger*, 456 U.S. at 320.    The

Government's asserted interests are compatible with judicial resolution under the four-part injunction analysis because courts are able to weigh equitable considerations when security or foreign affairs interests are at stake. To hold otherwise would introduce an overbroad rule in conflict with controlling precedent. CBD's claim for injunctive relief does not implicate the second *Baker* factor.

### 3. Third *Baker* Factor—Judicial Competence

Considerations of the second and third *Baker* factors often closely relate because they involve "decisionmaking beyond courts' competence." *Zivotofsky*, 566 U.S. at 203 (Sotomayor, J., concurring). As noted above, the weighing of interests in the context of injunctive relief is not an action beyond judicial competence. Assessing the equities of injunctive relief does not require "an initial policy determination of a kind clearly for nonjudicial discretion." *See Baker*, 369 U.S. at 217. CBD's injunctive claim does not implicate the third *Baker* factor.

### 4. Fourth, Fifth, and Sixth *Baker* Factors

"Courts should be particularly cautious before forgoing adjudication of a dispute on the basis" of the final three *Baker* factors. *Zivotofsky*, 566 U.S. at 204 (Sotomayor, J., concurring). We treat the last three *Baker* factors in tandem. *See id.* (discussing the last three *Baker* factors as one group); *Alperin*, 410 F.3d at 544 (noting that *Baker*'s "tests are more discrete in theory than in practice, with the analyses often collapsing into one another").

For the fourth factor, enjoining executive action based on a violation of a statutory requirement does not express a lack of respect for the executive; if anything, an injunction expresses respect for Congress by vindicating its legislative

power.  We also doubt that injunctive relief even implicates the sixth factor—the issuing of various "pronouncements." An injunction here does not pronounce anything, and though it might imply internal conflict between the branches of government to outside observers, it does not speak on behalf of the United States.

As with declaratory relief, this case provides a tempting candidate for reliance on the fifth factor, "an unusual need for unquestioning adherence to a political decision already made."  *Baker*, 369 U.S. at 217.  The long-running diplomatic engagement between Japan and the United States on the construction of the base has already seen its fair share of twists and turns, and there is room to consider whether raising an additional obstacle at this time counsels against exercise of judicial power.  Nonetheless, reliance on this ground is extraordinary, and we find it unnecessary in this instance.

## C. Conclusion

We conclude that CBD has standing for its claim for injunctive relief and that the claim does not present a political question implicating any *Baker* factor.

## VI. Merits

Because the district court itself did not grant preliminary injunctive relief, there is no stay or injunction in place on the Government's base-related activities in Japan.  The Government did not move on the merits to dismiss CBD's claim for injunctive relief, and on appeal did not argue the merits, either.  We may affirm "on any basis supported by the record even if the district court did not rely on that basis." *United States v. Washington*, 969 F.2d 752, 755 (9th Cir. 1992) (internal quotation marks omitted).  Nonetheless, the

parties have presented to us threshold jurisdictional issues, and we act most prudently when we allow the district court to address the merits of claims in the first instance. *See Zivotofsky*, 566 U.S. at 201. Based on the current state of the record, and in light of the traditional four-factor test for preliminary injunctive relief, there is no basis for issuing an injunction at this time. *Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."). Even assuming that a NHPA violation has taken place, under the traditional injunction test, the national security interests of the Government are likely to outweigh the interests CBD asserts. *See id.* at 32–33 ("Given that the ultimate legal claim is that the Navy must prepare an EIS, not that it must cease sonar training, there is no basis for enjoining such training in a manner credibly alleged to pose a serious threat to national security."). But it is the district court's task to weigh the *Winter* injunction factors carefully, in the first instance, and in light of the circumstances of this case. We note, however, that even if the district court were to rule in the Government's favor on CBD's claim for injunctive relief, this does not mean that CBD's claims for declaratory relief necessarily must fail. *See Steffel v. Thompson*, 415 U.S. 452, 471 (1974) (noting "Congress' intent to make declaratory relief available in cases where an injunction would be inappropriate"); *Olagues v. Russoniello*, 770 F.2d 791, 808 (9th Cir. 1985) (Nelson, J., concurring in part and dissenting in part) ("Declaratory relief is a separate remedy to be awarded when warranted, even if an injunction under the same circumstances would be denied.").

## VII. Conclusion

We reverse the district court's dismissal of CBD's declaratory relief claims because CBD has Article III standing for these claims. We affirm that the claims do not present a political question. We reverse the district court and hold that CBD has Article III standing to pursue injunctive relief and that its claims for injunctive relief do not present a political question. We remand to the district court for further proceedings.

**REVERSED and REMANDED**.